**ATLANTIC DISCOUNT COMPANY, Inc.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 70-931-Civ-J.**

United States District Court,
M. D. Florida,
Jacksonville Division.

March 8, 1972.

William R. Frazier, Fred M. Ringel, Jacksonville, Fla., for plaintiff.

Aaron K. Bowden, U. S. Atty., Jacksonville, Fla., James M. Stabler, Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CHARLES R. SCOTT, District Judge.

This case having been heard before the Court without a jury on December 1 and 2, 1971, in Jacksonville, Florida, and upon consideration of the pleadings, the pre-trial stipulation of the parties, testimony of witnesses, documentary evidence and oral argument of counsel for the respective parties, this Court hereby enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1.  Atlantic Discount Company, Inc., plaintiff in this cause, is a corporation organized and existing under the laws of

the State of Florida and maintains its principal office and place of business at Jacksonville, Florida.

2. During the years involved in this action, plaintiff was engaged in the consumer finance business in the City of Jacksonville, Florida, and the surrounding region. Plaintiff engaged in financing consumer purchases of new and used automobiles and in making working capital loans to new and used car dealers. Such financing is commonly known as floor plan or wholesale financing.

3. Plaintiff keeps its books and records on a calendar year basis, utilizes the accrual method of accounting and files its corporate income tax returns accordingly.

4. Plaintiff's corporate returns for the calendar years 1963 and 1964 were filed with and in the office of the District Director of Internal Revenue at Jacksonville, Florida, within the time and manner prescribed by law and the tax shown to be due on said returns was paid to the United States government.

5. Subsequent to the filing of plaintiff's returns for the calendar years 1963 and 1964, the Commissioner of Internal Revenue, acting through one of his authorized agents, caused a field audit to be made of these returns.

6. Plaintiff, for the years involved in this case and for many years prior thereto, claimed its deduction for bad debts by maintaining a bad debt reserve and by taking annual deductions for reasonable additions to the reserve in accordance with the provisions of § 166(c) of the Internal Revenue Code of 1954.

7. During the calendar years in question and for many taxable years prior thereto, plaintiff consistently maintained its bad debt reserve as of the end of each calendar year in an amount equivalent to two and one-half percent (2½%) of its retail notes receivable on hand as of the end of each taxable year.

8. Plaintiff's deduction for bad debts has at all pertinent times been computed as follows:

(a) The reserve for the end of each taxable year is computed on the basis of taking two and one-half percent (2½%) of the total retail notes receivable outstanding at the end of the year; and

(b) Adding thereto the actual charges to the reserve during the taxable year, thereby giving the total reserve requirement; and

(c) From the total reserve requirement, plaintiff subtracts the total reserve as of the end of the immediately preceding taxable year; and

(d) The difference as thus computed was either charged as an allowable addition to or reduction of the bad debt reserve.

9. Plaintiff made an addition to its reserve for bad debts in the amount of $132,999.90 for the taxable year ended December 31, 1963. Plaintiff claimed this amount as a bad debt deduction in filing its return for said year. Plaintiff determined its bad debt ceiling by applying a factor of 2.5% against its retail notes receivable as of the end of 1963 in the amount of $12,926,794, resulting in a loss reserve at the end of the period of $323,169.86. Plaintiff made a similar addition to its bad debt reserve in the amount of $192,547.01 as of December 31, 1964. Plaintiff determined its bad debt ceiling by applying a factor of 2.5% against its retail notes receivable as of the end of 1964 in the amount of $13,940,015, resulting in a loss reserve at the end of the period of $348,500.

10. Plaintiff, in filing its 1964 return, claimed a bad debt deduction of $237,937.99, consisting of two items: (a) the sum of $192,547.01 constituting the addition to the bad debt reserve for the year, and (b) plaintiff claimed an additional bad debt deduction of $45,390.98, making a total bad debt deduction claimed of $237,937.99.

11. With respect to the $45,390.98 claimed, the following explanation accompanied plaintiff's 1964 return: "Loss reserve of subsidiary transferred

**580**

to parent upon dissolution of subsidiary disallowed upon Agent's examination of subsidiary. Deduction this year to restore reserve to proper percentage."

12. The commissioner's examining agent changed plaintiff's method of accounting with respect to its addition to its bad debt reserve by imposing a ceiling to the bad debt reserve as follows:

(a) The examining agent utilized plaintiff's bad debt experience computed on a five-year moving average and considered only plaintiff's experience during the five-year period immediately prior to each of the years in question; and

(b) The agent reduced plaintiff's retail loans receivable as the base to be used in the computation by the amount of plaintiff's unearned discount attributable to its retail notes receivable outstanding as of each of the years involved.

13. Plaintiff's retail notes receivable, unearned discount and net receivables were:

| Year | Retail Notes Receivable | Unearned Discount | Net Receivables |
|------|------------------------|-------------------|------------------|
| 1963 | $12,926,794 | $1,545,955 | $11,380,838 |
| 1964 | $13,940,015 | $1,657,666 | $12,282,348 |

14. For the taxable year 1963, the examining agent determined that based on the five-year moving average computation that plaintiff's experience factor should be limited to 1.965 and that this factor should be applied against plaintiff's gross receivables less unearned discounts in the amount of $11,380,838.19. This computation resulted in a reserve ceiling of $223,657.37, in lieu of $323,169.86, as claimed by plaintiff. The result of this action was that the examining agent reduced plaintiff's claimed bad debt deduction for the year 1963 in the amount of $99,512.49.

The commissioner's computation of this adjustment, as shown by the statutory notice, is as follows:

| | |
|---|---|
| Gross receivables less unearned discounts | $ 11,380,838.19 |
| Experience factor (1963) | .0196521 |
| Reserve ceiling | $ 223,657.37 |

| | |
|---|---|
| Corrected reserve (12/31/63) | $ 223,657.37 |
| Add charges to reserve—1963 | 116,987.52 |
| Total reserve requirement | $ 340,644.89 |
| Less reserve as of 12/31/62 | 307,157.48 |
| Allowable addition to reserve | $ 33,487.41 |
| | |
| Bad debt deduction per return | $ 132,999.90 |
| Bad debt deduction corrected | 33,487.41 |
| Bad debt disallowed | $ 99,512.49 |

15. For the taxable year 1964, the examining agent determined that plaintiffs experience factor based on the five-year moving average computation amounted to 1.801. This factor was then applied to plaintiff's gross receivables less unearned discounts in the amount of $12,282,348.60, resulting in a reserve ceiling of $221,250.54, in lieu of $348,500.38, as claimed by plaintiff. The result of the examining agent's action was that he disallowed plaintiff's claimed bad debt deduction by the sum of $73,128.33.

The commissioner's computation of this adjustment, as shown by the statutory notice, is as follows:

| | |
|---|---|
| Gross receivables less unearned discounts | $ 12,282,348.60 |
| Experience factor (1964) | .0180137 |
| Reserve ceiling | $ 221,250.54 |
| | |
| Corrected reserve (12/31/64) | $ 221,250.54 |
| Add charges to reserve—1964 | 167,216.49 |
| Total reserve requirement | $ 388,467.03 |
| Less corrected reserve as of 12/31/63 | 223,657.37 |
| Allowable addition to reserve | $ 164,809.66 |
| | |
| Bad debt deduction per return | $ 237,937.99 |
| Bad debt deduction corrected | 164,809.66 |
| Bad debt disallowed | $ 73,128.33 |

16. Plaintiff, in filing its return for 1964, disclosed an operating loss of $19,290.53. This loss was carried back to 1961. Plaintiff, on or about June 15, 1965, filed a loss carryback application, Treasury Form 1139, which was tentatively allowed and a refund of a portion of its 1961 taxes was made in the amount of $10,031.07.

17. As a result of the agent's disallowing $73,128.33 of plaintiff's bad debt deduction for 1964, its operating loss disclosed by its return of $19,290.53 was converted to taxable income of $53,837.80.

18. By virtue of the disallowance of the net operating loss carryback of $19,290.53 from the calendar year ended

December 31, 1964, to the calendar year ended December 31, 1961, the commissioner assessed a deficiency for 1961 in the amount of $10,031.07, which represented the amount tentatively refunded to plaintiff.

19. Following the agent's examination, the commissioner issued a statutory notice of deficiency against plaintiff dated February 15, 1967, disclosing deficiencies as follows:

| Taxable Year Ended | Deficiency |
|---|---|
| 12/31/61 | $ 10,031.07 |
| 12/31/63 | 49,841.55 |
| 12/31/64 | 19,522.64 |
| TOTAL | $ 79,395.26 |

Thereafter, these deficiencies, together with interest, were paid in full by plaintiff on March 9, 1967, in the amount of $91,826.22.

20. On November 20, 1968, plaintiff filed with the District Director of Internal Revenue for the District of Florida claims for refund for the deficiencies and interest paid by it for the calendar years 1961, 1963 and 1964, as follows:

| Taxable Year Ended | Amount Claimed |
|---|---|
| 12/31/61 | $ 11,335.11 |
| 12/31/63 | 58,678.46 |
| 12/31/64 | 21,812.65 |

These claims were filed within the time prescribed by law. Thereafter, plaintiff instituted this action seeking refund of the deficiencies and interest paid by it with respect to the three taxable years in question.

21. The examining agent testified at the trial that in disallowing portions of the bad debt deduction claimed by plaintiff for the calendar years 1963 and 1964, he gave consideration to no factors other than the previous experience of plaintiff for the five immediately preceding years which was reflected in his five-year moving average computation.

22. During 1963, plaintiff's volume of wholesale finance business amounted to the sum of $16,580,034.41. On December 31, 1963, it had wholesale notes receivable totalling $1,338,026.10. Plaintiff also had other finance receivables on said date of $668,600.00. Plaintiff's tax return for 1963 at Schedule F indicated that it had total notes and accounts receivable outstanding at the end of said year of $16,622,005.00.

23. In 1964, plaintiff's volume of wholesale business amounted to $21,271,745.00. On December 31, 1964, its wholesale notes receivable on hand amounted to $2,270,941.00. Plaintiff also had other finance receivables on said date of $705,490.00. Plaintiff's tax return for 1964 at Schedule F indicated that it had total notes and accounts receivable outstanding at the end of said year of $19,839,782.00.

24. Plaintiff's reserve for bad debts for the two years involved in this case was intended to protect it against future losses, both with respect to its retail notes receivable, as well as all other trade notes and accounts receivable, including its wholesale and other finance receivables.

25. An analysis of plaintiff's loss reserve and loss experience for the years 1958 to and including 1967 is:

| Year | Retail Notes Receivable | Unearned Discount | Net Receivables | Loss Reserve Beginning | Provision |
|---|---|---|---|---|---|
| 1958 | 9,994,308 | 1,225,348 | 8,768,959 | 225,080 | 217,173 |
| 1959 | 10,762,768 | 1,344,233 | 9,418,534 | 249,857 | 228,322 |
| 1960 | 8,403,634 | 1,361,157 | 7,042,476 | 269,069 | 276,184 |
| 1961 | 7,433,797 | 914,723 | 6,519,074 | 210,090 | 133,838 |
| 1962 | 12,286,299 | 1,419,624 | 10,866,675 | 185,844 | 120,605 |
| 1963 | 12,926,794 | 1,545,955 | 11,380,838 | 307,157 | 132,999 |
| 1964 | 13,940,015 | 1,657,666 | 12,282,348 | 323,169 | 192,547 |
| 1965 | 12,952,770 | 1,532,191 | 11,420,578 | 348,500 | 230,054 |
| 1966 | 11,332,361 | 1,367,167 | 9,965,194 | 323,819 | 277,776 |
| 1967 | 11,800,094 | 1,505,727 | 10,294,366 | 283,615 | 183,400 |

26. The uncontradicted testimony and the documentary evidence produced indicates that plaintiff's management considered the following factors during each of the pertinent years in determining the amount by which plaintiff should increase its bad debt reserve and pursuant to which plaintiff claimed its deduction for bad debt losses:

(a) Plaintiff's management carefully considered the actual bad debt experience of plaintiff for the year in which additions to the reserve were being created, as well as past history and future expectations.

(b) Plaintiff's management carefully considered industry-wide composite figures for consumer finance companies which included figures relating to the adequacy of bad debt reserves. These figures were published by various financial institutions, including The First National Bank of Chicago and The Chase Manhattan Bank of New York.

(c) The fact that plaintiff experiences wide and violent yearly fluctuations in repossession of financed vehicles and, therefore, corresponding and resultant bad debt losses, was considered by plaintiff's management. Such fluctuations depend upon general economic and business conditions, the state of the new and used car market and the prices and sales volume of new and used cars.

(d) Plaintiff's experienced bad debt losses are directly related to the general economy and particularly to the condition of the new and used car markets. In a year when the economy is good and new and used car sales are in an uptrend, plaintiff experiences lower credit losses as a result of decreased repossession of vehicle financed. But when the economy swings downward, as is frequently and abruptly the case, plaintiff's losses from repossessions increase and greatly accelerate.

(e) Because of the fluctuations in the business cycle and the corresponding credit losses suffered by plaintiff from time to time, its management considers it necessary at all times to maintain adequate reserves for bad debt losses in order to protect the company.

(f) Plaintiff was required to maintain adequate bad debt reserves in order to maintain its credit line with institutional lenders which includes commercial banks and life insurance companies. In this connection, plaintiff is a financial intermediary, borrows most of the funds it uses in the wholesale money market from institutional lenders and relends its funds by way of wholesale floor plan loans to new and used automobile dealers and to finance customers who have purchased automobiles at retail. Since substantial institutional credit lines are critical to plaintiff's operation, its management was at all times cognizant of maintaining adequate bad debt reserve ratios.

Since plaintiff's volume of business was expanding during the years in question, larger reserves were required to cover adequately the exposure of an increasing amount of receivables and to satisfy the institutional lenders.

Plaintiff's banking contact maintained the position, with respect to plaintiff and other like institutions, that a reserve equivalent to two and one-half percent ($2\frac{1}{2}\%$) of total retail contracts outstanding was a minimum reserve for credit purposes.

(g) Plaintiff's bad debt reserve serves as a reserve for all its credit losses, including its retail contracts receivable and its wholesale loans to new and used car dealers and also other direct finance loans receivable.

(h) The adequacy of the reserve for bad debt is also related to the usual 24 to 36 month time period required to liquidate plaintiff's retail finance receivables. In many instances plaintiff acquires retail contracts with balloon balances that are often renewed by a customer and the payoff period with respect to such receivables can run from 48 to 60 months in duration.

(i) Plaintiff required adequate reserves for losses from bad debts during the years involved in this case because of the accelerating potential for losses due to a substantial increase in competition in the automobile finance business which was caused by the entry into the market of commercial banks and the captive finance companies of major manufacturers, *including* General Motors, Ford and Chrysler Corporation.

(j) Because of such competition and the general state of the economy, it was necessary for plaintiff to accept contracts with lower down payments and lengthened repayment terms and to relax its normal credit standards. This resulted in greater actual credit losses.

(k) The captive finance companies of the major manufacturers were extremely competitive, since the automobile manufacturers subordinated the profits of the captive finance companies to their interest in the sale of automobiles. Consequently, the normal profit basis for the automotive finance industry was undercut. During the years in question plaintiff was forced to meet this competition. Plaintiff's management believed that in so doing the credit losses would increase and that, therefore, the bad debt reserve had to be adequate to cover this development.

(*l*) Plaintiff during the years in question operated not only in the retail and wholesale automobile finance business but also through wholly-owned subsidiaries which engaged in the consumer small loan business. Plaintiff, as a parent corporation, arranged for and concluded all institutional borrowings for its own business needs and for those of its subsidiaries. Because of this financial structure the institutional lenders looked solely to plaintiff's financial standing which included the adequacy of its reserve for bad debts.

(m) In addition to the reliance on the published industry-wide composite figures heretofore discussed, plaintiff relied on the expert advice and recommendations of its national auditing firm, Peat, Marwick, Mitchell & Company.

(n) Because of the nature of plaintiff's business the company's management concluded that it was necessary that the bad debt loss reserve be maintained at a figure somewhat greater than that barely necessary to cover the losses in a particular year. This conclusion was based upon consideration of the requirements of the institutional lenders and especially on the fact that plaintiff's business often experiences shock losses.

(*o*) Plaintiff's management was constantly studying general economic and business conditions in order to anticipate the forthcoming economic and commercial environment so that present financial operations could be adjusted to anticipate the future economic and commercial environment.

(p) Plaintiff's management felt that it was absolutely necessary that it maintain a constant reserve. Plaintiff's management felt that it could not as a matter of business judgment reduce the reserve merely because the present or preceding year was a good year from the standpoint of credit losses.

(q) Plaintiff's management was in constant contact with highly regarded business acquaintances in the national consumer finance industry and particularly those in the State of Florida, and had access to information concerning their bad debt loss reserves. Plaintiff's officers considered the bad debt reserve used by another Jacksonville firm, U. S. Finance Company, and another firm of Orlando, Florida, known as Acceptance Corporation of Florida.

27. Plaintiff, in filing its 1964 return, claimed a bad debt deduction in the amount of $237,937.99, consisting of its addition to its bad debt reserve for said year of $192,547.01, and, in addition thereto, a bad debt deduction of $45,390.98. This amount had previously been recorded on the books of plaintiff

upon dissolution of the subsidiary, Consumers Finance Corporation, and had not been deducted by plaintiff for tax purposes. The item of $45,390.98 represented a loss reserve of a subsidiary transferred to plaintiff upon the dissolution of the subsidiary which was disallowed by an internal revenue agent's examination of the books and records of the subsidiary. Plaintiff's comptroller deducted this sum to restore plaintiff's reserve for bad debts to the proper amount.

28. In dissolving the subsidiary in 1962, plaintiff took over all assets and liabilities of the subsidiary, consisting of all of its finance accounts receivables. The internal revenue agent examining the subsidiary's records restored the balance in the reserve to income as of the date of liquidation and the commissioner thereafter assessed a tax deficiency against the subsidiary.

29. The Commissioner of Internal Revenue, in issuing to plaintiff the statutory notice of deficiency for 1964, did not specifically refer to the disallowance of all or any part of the $45,390.98 item, as such. The commissioner disallowed plaintiff's bad debt deduction to the extent of $73,128.33, which resulted from the examining agent's imposing a reserve ceiling as of December 31, 1964, of $221,250.54 and a similar reserve ceiling for the period ended December 31, 1963, in the amount of $223,657.37. The commissioner concluded that the allowable addition to plaintiff's reserve for 1964, and hence its deduction for bad debts for the year, amounted to $164,809.00, and not $237,937.99, as claimed by plaintiff on its return, thereby reducing the bad debt deduction by the sum of $73,128.33.

30. Neither the commissioner's 30-day letter of October 27, 1966, nor the statutory notice of deficiency dated February 15, 1967, disclosed that the commissioner was disallowing all or any part of the $45,390.98 additional bad debt deduction claimed by plaintiff in filing its 1964 return. The partial disallowance of plaintiff's bad debt deduction for 1964 related solely to its addition to its bad debt deduction of $192,547.00.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under 28 U.S.C. § 1346(a) (1).

2. § 166 of the Internal Revenue Code of 1954 provides for a deduction for bad debts. Pursuant to that section, a taxpayer is allowed to deduct the full amount of all business debts which actually become worthless during the taxable year. 26 U.S.C. § 166(a). In lieu of that deduction for actual bad debts, there is provision for utilizing a reserve method for computing deductions for bad debts, as was done in the case at hand. 26 U.S.C. § 166(c).

3. In computing its addition to the bad debt reserve for the years 1963 and 1964, plaintiff incorrectly applied the 2.5% ratio to gross receivables outstanding at the end of this year. The proper method for computing the addition to the bad debt reserve was to apply the proper ratio to net outstanding receivables at the end of the year (gross outstanding receivables less unearned discount equals net receivables). Revenue Ruling 63–122, Cum.Bull. 1963–2, 98. Central Banking Company, T.C.M. 1964–259 (1964); Voliva v. Commissioner of Internal Revenue, 36 F.2d 212 (C. A.7, 1929).

4. The Court finds that plaintiff has borne its burden of proving that it is entitled to deduct the sum of $45,390.98 for the taxable year ended December 31, 1964, by way of an additional bad debt deduction as a result of the loss reserve of its subsidiary transferred to plaintiff upon dissolution of the subsidiary, the reserve having been adjusted by a revenue agent upon audit of the subsidiary's records as of the date of liquidation.

5. Plaintiff's addition to a reserve for bad debt was reasonable under the facts of this case, and this was shown by clear and overwhelming proof. Patterson v. Pizitz, Inc., 353 F.2d 267 (5th Cir. 1965); Krim-Ko Corp. v. Commissioner of Internal Revenue, 16 T.C. 31 (1951).

6. Plaintiff has shown by the clearest proof that the commissioner abused his discretion in solely applying a five-year moving average formula. Southeastern Finance Co. v. Commissioner of Internal Revenue, 4 T.C. 1069 (1945), aff'd 153 F.2d 205 (5th Cir. 1946). In this case the Court recognizes that the burden is on the plaintiff-taxpayer to show an abuse of discretion. The Court concludes that the plaintiff has met its heavy burden; and, in so concluding, the Court has given more than a mere presumption of correctness to the commissioner's determination. Maverick-Clarke Litho Co. v. Commissioner of Internal Revenue, 180 F.2d 587 (5th Cir. 1950). In concluding that the commissioner abused his discretion, this Court is not substituting its judgment for that of the commissioner but is, rather, concluding that the commissioner's refusal to permit the plaintiff's reasonable addition was arbitrary and capricious and, therefore, an abuse of discretion. The commissioner's exercise of discretion was arbitrary since the determination was based on the sole consideration of the five-year moving average. This mechanistic computation was defective in two respects: first, it wholly disregarded the criteria set out in Treas. Reg. § 1.66–4(b) (1) and, second, it failed to make an adjustment between known and existing circumstances and experience. Calavo, Inc. v. Commissioner of Internal Revenue, 304 F.2d 650 (9th Cir. 1962); Patterson v. Pizitz, Inc., 353 F.2d 267 (5th Cir. 1965).

A final judgment will hereinafter be entered in accordance with these findings and conclusions.