Jerald M. **RICHARDSON** et al.

v.

**UNITED STATES of America.**

Civ. A. No. 68–H–1014.

United States District Court,
S. D. Texas,
Houston Division.

July 7, 1971.

Robert I. White, Thomas B. Crawford, Jr., Chamberlain, Hrdlicka, White & Waters, Houston, Tex., for plaintiffs.

Anthony J. P. Farris, U. S. Atty., George R. Pain, Asst. U. S. Atty., Houston, Tex., Johnnie M. Walters, Asst. Atty. Gen., Myron C. Baum and D. Wendell Barnett, Attys., Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM AND ORDER

BUE, District Judge.

This action was commenced by the plaintiffs, Jerald M. Richardson, and Pauline K. Richardson, husband and wife, Bernard C. Richardson and Jean Hollis Richardson, husband and wife; Mrs. T. Delma Richardson and the Estate of Leo D. Richardson, under 28 U.S. C. § 1346(a) (1) against the defendant for the refund of income taxes in the amount of $71,953.35, plus assessed and statutory interest for their calendar years ending 1964 and 1965.[1]

The plaintiffs paid all of the income taxes assessed against them for 1964 and 1965, including additional taxes assessed pursuant to an examination of their original return,[2] and filed timely claims for refund for those years. Subsequently, the instant action was commenced.

Plaintiffs were essentially the sole stockholders of Richardson Chevrolet Company, a Texas corporation, [hereinafter referred to as the Company] during the years in question.[3] Incident to its corporate business activities from 1949 through 1959, Richardson Chevrolet Company accumulated earnings and profits of $660,521.84. Effective January 1, 1960, the Company became an electing small business corporation within the meaning of Sections 1371 through 1379 (Subchapter S) of the Internal Revenue Code of 1954, having filed an appropriate corporate election and shareholder consent within the first month of 1960.

---

1. The wives are parties to this action solely as a result of their filing joint income tax returns with their husbands for the taxable years involved. Hereinafter, all references to plaintiffs shall refer to J. M. Richardson, B. C. Richardson, and Leo D. Richardson, all brothers.

2. As a result of examination of the income tax returns filed by Richardson Chevrolet Co. and the three brothers, the Internal Revenue Service determined that the three brothers owed additional income taxes based upon the following principles:
(A.) The sale by Richardson Chevrolet Co. of the 5.35 acre Harwin tract for $213,980.04 was a taxable distribution of property to the extent of $112,564.36; this treatment was premised upon the Government's determination that the fair market value of the land on the date of sale was $326,544.40, and that the Richardsons, accordingly, made a "bargain purchase."
(B.) The building used by Richardson Chevrolet Co. in its business was treated as having a useful life of 40 years rather than 30 years as claimed on the tax return and depreciation deductions claimed with respect to the building were diminished.
(C.) Richardson Chevrolet Co.'s allowance for uncollectible receivables at December 31, 1964, and December 31, 1965, of $8,047.58 and $16,930.93, respectively, were overstated. The amounts that should have been provided for uncollectible receivables at those two dates are $4,856.98 and $6,839.64. Accordingly, the Government disallowed bad debt expense to the Company.

3. One share of stock was held by the plaintiffs' secretary, E. E. Kennedy.

The provisions of Subchapter S have applied continuously to the Company from 1960 forward. Consequently, during the years 1960 through 1965, the Company accumulated no earnings and profits because all of its earnings were taxed directly to the shareholders.

On February 13, 1963, the Company purchased 13.127 acres of land. The cost of the property approximated $.92 per square foot. The property is triangular in shape, fronting onto the Southwest Freeway feeder street, Hillcroft, and Harwin. For various business reasons, it was decided that the Company would dispose of a strip of the tract in question some 225 feet deep, fronting on Harwin. This back 5.35 acres, or 233,246 square feet, was sold by the Company to the three Richardson brothers in a ratio of their stock holdings on July 1, 1964, at an approximate cost of $.92 per square foot. No gain or loss was reported by the Company on this transaction.

The Commissioner of Internal Revenue Service determined that the transaction was a taxable transfer of property and that the fair market value of the property at the time of sale was approximately $1.40 per square foot. This adjustment resulted in a determination that the Company had made a taxable dividend distribution of $112,564.36 to its shareholders, such amount being the difference in the fair market value and the actual sale price of the property.

During 1970, the Richardson brothers sold back to the Company 2.7221 acres of the 5.35 acre back tract, 85 percent at $.92 per square foot and 15 percent at $1.48 per square foot.[4]

The 5.35 acre tract, or the Harwin tract, had a fair market value of approximately $.92 per square foot in February of 1963, the date originally purhased by the Company. At issue in this case is the fair market value of the Harwin tract as of the date in July of 1964 when the tract was transferred by deed to the plaintiffs. Before that issue is reached, however, the Court must resolve the variance issue raised by the Government concerning this Court's jurisdiction to hear grounds for recovery which allegedly are not encompassed by the wording of the taxpayer's claim for refund.

## I.

## VARIANCE

After payment of taxes by the plaintiffs, timely claims for refund were filed by each, identical in terms and setting forth the following grounds for refund:

The Commissioner erroneously determined that there was a distribution of property on August 2, 1964 (5.3546 acres of land) which constituted a proportionate dividend to taxpayers in 1964 for the following reasons:

(1) There was no taxable distribution of property but merely a rearrangement of legal title to effect needed, long-term corporate financing. No dividend distribution was ever intended.

(2) Alternatively, if there was a distribution of property, full consideration was paid and the fair market value of the property distributed was $213,980.04 or $.92 a square foot and not $326,544.40 or $1.40 a square foot as determined by the Commissioner.

The Government urges that the language in paragraph one [5] of the claim was read

4. Previous to this sale, Leo Richardson died, and his second wife, T. Delma Richardson, acquired all of the property rights of Leo's two children in the 5.35 acre tract. In January of 1968, J. M. Richardson and B. C. Richardson purchased from T. Delma Richardson the undivided 15 percent interest she owned in this tract for $51,894.40, or $1.48 per square foot. Thus, 85 percent of the tract was sold back to the Company at the original price; 15 percent of the tract was resold at $1.48 per square foot, which price represents the brothers' additional costs in purchasing from T. Delma Richardson.

5. Paragraph 2 of the claim is concerned exclusively with the issue of fair market value of the property, and there is no dispute as to the propriety of the Court's jurisdiction over that matter.

by the Commissioner and counsel for the defense, and was intended originally by the plaintiffs to assert as a ground for refund a constructive trust. That is, this language was originally taken by all parties to indicate that the transaction was not intended to be a dividend, but was a transfer of bare legal title with equities remaining in the Company, for purposes of securing corporate financing.[6] Plaintiffs, however, argue that paragraph one was sufficient to raise a claim that any excess of fair market value over cost was a non-taxable distribution of the Company's previously taxed income rather than a distribution or dividend from accumulated earnings and profits which would be fully taxable to the shareholder. Of necessity, the interpretation urged by plaintiffs includes the contention that the Treasury Regulations which provide that distribution of property other than money from a Subchapter S corporation can not be deemed a distribution of previously taxed income are erroneous.

 In rendering decision on this question, two important principles supply the Court's frame of reference. First, the allowance of claim and suit for refund are made as exceptions to the jurisdictional doctrine of sovereign immunity, and policy dictates that such exceptions must be strictly construed, requiring compliance with even purely formal or technical conditions imposed upon the exception, Rock Island, Arkansas & Louisiana R. R. Co. v. United States, 254 U.S. 141, 143, 41 S.Ct. 55, 65 L.Ed. 188 (1920). *See also* United States v. Felt & Tarrant Co., 283 U.S.

269, 273, 51 S.Ct. 376, 75 L.Ed. 1025 (1931).[7] Second, strict compliance is required to insure an orderly administration of the revenue, i. e., to give the Commissioner sufficient notice of all grounds and facts intended to be asserted in order that an administrative determination might be made on the whole. Not to do so would thwart the Commissioner's administration and would burden the Courts by requiring them to hear claims which might never have needed litigation. *See* United States v. Felt & Tarrant Co., 283 U.S. at 272, 51 S.Ct. 376. *See generally* United States v. Andrews, 302 U.S. 517, 58 S.Ct. 315, 82 L.Ed. 398 (1938); French v. Smyth, 110 F.Supp. 795 (N.D.Cal.1952), aff'd per curiam sub nom, French v. Berliner, 218 F.2d 351 (9th Cir. 1955).

The applicable Treasury Regulations on Procedure and Administration, § 301.-6402–2(b) (1) require that:

> The claim must set forth in detail *each ground* upon which a credit or refund is claimed *and facts* sufficient to apprise the Commissioner of the exact basis thereof. \* \* \* A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit. (emphasis supplied)

 Plaintiffs urge that the isolated words "no taxable distribution of property" in paragraph one was certainly notification to the Commissioner that the shareholders claim the distribution to be non-taxable. The Court cannot agree. Those few words, taken out of context, might conceivably support plaintiffs'

---

6. *See* the discussion of the details of the property transfer in n. 10, *infra.*

7. No suit for refund of taxes may be brought against the United States unless a valid claim for refund has first been filed. The applicable provision of the Internal Revenue Code of 1954 is Section 7422, which provides in part as follows:

 (a) *No suit prior to filing claim for refund.*—No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax al-

leged to have been erroneously or illegally assessed or collected \* \* \* until a claim for refund or credit has been duly filed with the Secretary or his delegate, according to the provisions of law in that regard, and the regulations of the Secretary or his delegate established in pursuance thereof.

It is clear from the above quoted statute that the filing of a claim is a condition precedent to a suit for refund in this Court, and the claim must comply with the Regulations promulgated by the Secretary of the Treasury.

present contention. However, this Court can only view such a contention in its full context. Thus, the entirety of paragraph one of the claim cannot in any sense be taken to mean that a non-taxable dividend distribution was intended. Such construction is actually precluded in the last sentence of that paragraph. Moreover, in order to presume that the Commissioner was put on notice of the plaintiff's claim that the excess in value of the property was a dividend from previously taxed income, it must also be presumed that the Commissioner was aware the plaintiffs further contended that Treasury Regulation 1.1375–4(b) is invalid. Such an argument can only be categorized as specious.

In United States v. Garbutt Oil Co., 302 U.S. 528, 58 S.Ct. 320, 82 L.Ed. 405 (1938), the stated ground for recovery— that the Company was entitled to reduce its taxable income—was held insufficient to raise the issue that the Company had, in fact, received no income. Similarly, in Alabama By-Products Corp. v. Patterson, 258 F.2d 892 (5th Cir. 1958), it was held that where taxpayer's claim for refund was based on the ground that there was no representative market price, taxpayer could not assert in court that the existing representative price was incorrect. The Court of Appeals for the Fifth Circuit found a fatal variance, in Carmack v. Scofield, 201 F.2d 360 (5th Cir. 1963), between the grounds urged in the claim for refund—alleging that plaintiffs had paid taxes in a previous year on poker winnings and that allowance for such winnings had not been made in determination of a tax deficiency for the year following—and the grounds urged upon trial of the case, alleging no poker earnings for the previous year. *See also* United States v. Hancock Bank, 400 F.2d 975 (5th Cir. 1968).

These cases clearly point out that the regulation requires that the grounds for refund claims and facts pertinent thereto be set out with specificity.[8] The requirement is a practical one enabling the Commissioner to determine at the outset the answers to important inquiries:

> How is the refund claim to be handled administratively, to what issues and points is the Commissioner's attention directed, what facts must the Commissioner ascertain, is the investigation necessitated by the claim one of fraud or limited scope, does the claim indicate that the Commissioner must take affirmative action to protect the government against the running of statutory periods on assessments?

United States v. Hancock Bank, 400 F.2d 975, 981 (5th Cir. 1968); Samara v. United States, 129 F.2d 594, 597–98 (2nd Cir. 1942), cert. denied, 317 U.S. 686, 63 S.Ct. 258, 87 L.Ed. 549 (1942).

Since the uncontroverted evidence clearly shows that the plaintiffs failed

---

8. In Alabama By-Products Corp. v. Patterson, 258 F.2d 892, 900 (5th Cir. 1958), cert. den., 358 U.S. 930, 79 S.Ct. 318, 3 L.Ed.2d 303 (1959), the Court stated:

> We affirm also the dismissal of the amended claims for refund. All grounds upon which a taxpayer relies must be stated in the original claim for refund so as to apprise the Commissioner of what to look into; the Commissioner can take the claim at its face value and examine only those points to which his attention is necessarily directed. * * * Anything not raised at that time cannot be raised later in a suit for refund. Carmack v. Scofield, 5 Cir., 1953, 201 F.2d 360, 362. The taxpayer's claim for refund was based solely on the ground that there was no representative market price. There was no attempt to raise the question of the correctness of an existing representative price. In fact, the claim for refund precluded this question. There was likewise no attempt to raise the question of any improper allocation of overhead and other expenses.
>
> What we said in the *Carmack* case applies with equal vigor here:
>
> "A taxpayer is not permitted to advance one ground for refund in his claim filed with the Commissioner and thereafter rely upon an entirely different ground in a subsequent suit for refund, *but is confined to the scope of the grounds for refund asserted in his claim filed with the Commissioner.*" (Emphasis supplied).

to set forth *in any manner*, much less in detail, the allegation relating to treating the difference between fair market value and sales price as a distribution of the Company's undistributed taxable income previously taxed, the claim did not, nor could it, generate any factual investigation by the Commissioner.

The plaintiffs had until February 19, 1970, and March 8, 1970, to file additional or supplemental claims for refund for the years in question. Their failure to do so prevents them from asserting grounds not encompassed in the original claim.

Thus, as recognized in the foregoing cases, a refund suit seeking recovery upon a ground not set forth in the refund claim is as jurisdictionally defective as a suit which is instituted without any refund claim having previously been filed. *See* Nemours Corp. v. United States, 188 F.2d 745 (3d Cir. 1951), cert. denied, 342 U.S. 834, 72 S.Ct. 50, 96 L.Ed. 631 (1951).

For the foregoing reasons, this Court lacks jurisdiction to entertain plaintiffs' contention that any accretion in the value of the subject property is a distribution of the Company's undistributed taxable income previously taxed.

## II.

## FAIR MARKET VALUE

Thus limited, the sole issue before the Court concerning the property transfer is whether the sale by the Company of the Harwin tract to its three shareholders constituted a taxable distribution of property; that is, whether the Richardson brothers made a bargain purchase of the tract from the Company.

Expert testimony was introduced by both parties from experienced real estate appraisers.[9] Taking into consideration the independent determinations of such experts as to the fair market value of the Harwin tract on July 1, 1964, in a normal transaction and with no restrictions on the use of the property by the purchaser,[10] the Court finds that there was a bargain purchase involved in the sale, in that the fair market value exceeded the price actually paid. The Court further finds, on the basis of the expert appraisal testimony and other relevant factors adduced from the roof, that the fair market value of the Harwin tract at the date in issue under the circumstances present was $1.05 per square foot.

## III.

## BAD DEBT RESERVE

The Company has always used the method of accounting prescribed for GM dealers by the General Motors Corporation in maintaining its various books and records. Under that method of accounting, provision is made on the books for possible uncollectible receivables in an amount equal to all accounts receivable over 90 days old. This same method is used by all General Motors dealers and is also prescribed for use by all Ford and American Motors dealers.

Following this procedure, the total amount of accounts receivable was calcu-

---

9. Mr. Ralph Farson and Mr. Norvel Favela, conducting independent studies using the market data or comparative approach, established a range of $1.03 to $1.07 per square foot as the fair market value of the tract in July, 1964. Mr. David Lewis, using the same method and a comparable analysis, found the fair market value to be $1.40 per square foot.

10. There has been submitted evidence to show that the Richardson brothers, in effecting a deed from the Company to themselves, did not intend a transfer of the property without restrictions. Rather, extensive restrictions were placed on the use of the property, a requirement was imposed that it be sold back to the Company on demand, and all such conditions and restrictions were in fact honored. This evidence would, of course, have a significant effect on the value of the property in the hands of the vendees, the three brothers. However, the deed being unambiguous on its face, parol is inadmissible to vary its terms. 19 Tex. Jur. 2d § 120 at 416 and cases cited therein.

lated, and the reserve or provision for bad debts was either increased or decreased so as to equal the total of over 90 day old accounts. Accordingly, when management of the Company ascertained that a particular account receivable from a customer would not be collected, that specific amount was deducted from the reserve previously accumulated. Thus it was that during the year 1965, specific accounts aggregating $7,082.87 were charged off against the $8,047.58 balance of the reserve for bad debts on December 31, 1964. The account balance in that fashion was diminished to $964.71. During the course of 1965, only $97.04 was collected from previously charged-off customers' accounts and those collections were added back to the reserve for bad debts, increasing that balance to $1,061.75. At the end of 1965, the sum of all accounts receivable over 90 days old was $16,930.93. As a result, bad debt expense, a deduction for tax purposes, of $15,869.19, was entered onto the books, and that figure was added to the balance in the reserve, bringing the total up to $16,930.93.

The Internal Revenue Service disallowed the Company provisions and calculations for bad debts as of December 31, 1964 and December 31, 1965, and permitted only the sums of $4,856.98 and $6,839.64, respectively for the two years in question. These figures were calculated from an analysis of the Company's bad debt experience for the preceding five years by applying the formula approved in Black Motor Co., Inc. v. Commissioner, 41 B.T.A. 300 (1940), aff'd, 125 F.2d 977 (6th Cir. 1942).[11] Comparing the Company's claimed provision at the close of 1964 ($8,047.58) with the computation arrived at by the Government ($4,856.98), it is apparent when examining the Company's loss experience in 1965 ($7,082.87) that the Company's allowance is more nearly correct than the Government's.

■ The reserve method of accounting for bad debts is prescribed by Treasury Regulations on Income Tax § 1.166–4 (a) and (b). Under such regulations the amounts of the reserve for bad debts at the end of the year are to be determined based upon such considerations as conditions of business prosperity, the amounts of debts outstanding at the end of the year, and the age of the debts outstanding at the end of the year. When the Internal Revenue Service adjusts the taxpayer's reserve for bad debets, the plaintiff, in order to prevail, must demonstrate that the Internal Revenue Service abused its discretion in making such adjustments. Patterson v. Pizitz, Inc., 353 F.2d 267 (5th Cir. 1965).

■ From its inception until the summer of 1965, the Company maintained its business offices and showroom in downtown Houston. Unable to expand at that location, the Company moved to its present Sharpstown location, opening with vastly increased facilities and a consequent increase in business. Taking into consideration the Company's bad debt experience in 1965, its move to a new location in 1965 and the accompanying enormous increase in 1965 of the amount of gross sales, the Internal Revenue Service's allowance of $6,839.64 for that year was not only insufficient, but also was calculated in such a manner as to be completely unresponsive to the change in business circumstances encountered by the Company, and thus, was an abuse of discretion.[12] Accordingly, the Company's provisions and calculations for possible uncollectible receiva-

---

11. Bad debt reserves are computed from this formula by taking "the ratio of the average of the accounts and notes receivable which were outstanding at the end of the year plus those outstanding the preceding five years to the average of the debts actually charged off during the same period." S. W. Coe & Co. v. Dallman, 216 F.2d 566, 568 (7th Cir. 1954) ; 2

CCH 1971 Stand.Fed.Tax Rep. ¶ 1624.-099.

12. Unlike the taxpayers in S. W. Coe & Co. v. Dallman, 216 F.2d 566, 569 (7th Cir. 1954), the plaintiffs here do "claim that the reserve for bad debts as determined by the Commissioner was, in fact, not sufficient to cover the actual charge offs * * *."

bles for both 1964 and 1965 are viewed as realistic and in compliance with the applicable Treasury Regulations and are approved by this Court.

## IV.

### USEFUL LIFE OF BUILDING

In June of 1965, the Company completed construction of its new building on Hillcroft where its automotive sales and service business was thereafter conducted. On its income tax return, the Company claimed a useful life of thirty years on the building. Pursuant to the provisions of Rev.Proc. 62–21, 1962–2 Cum. Bull. 418, the Internal Revenue Service adjusted taxpayer's determination to set the useful life at forty years.

The Treasury Regulations promulgated pursuant to Section 167 of the 1954 Internal Revenue Code, Treas.Regs. § 1.-167(a)–1(b), provide that the useful life of a depreciable asset is not necessarily the useful life inherent in that asset, but rather the period over which the asset may reasonably be expected to be useful to a taxpayer in his trade or business or in production of his income. The regulation also prescribes that this determination of useful life is to be based upon experience with similar property. Finally the regulation prescribes that matters such as wear and tear, developments within the industry, and matters peculiar to the taxpayer's business, should be taken into account.

■ Taxpayers may elect not to have their depreciation deduction controlled under the guidelines of Rev.Proc. 62–21. If taxpayers so elect, as did plaintiffs, their depreciation claims are to be "examined individually under presently established procedures, without regard to this Revenue Procedure." Rev.Proc. 62–21, Part II, § 1; 2 CCH 1971 Stand. Fed. Tax Rep. ¶ 1713A.08. However, the Internal Revenue Service has used guideline lives under 62–21 as a rule of thumb, even for determining the useful lives of assets of non-electing taxpayers, Stevens Realty Co. v. Commissioner, P–H Memo T.C., ¶ 67,113 (1967). This was the practice followed by the Service in the instant case, and, although a comparable structure was not listed in the guidelines, the Government's expert sought to fashion approximations through the use of that source. In any event, the Commissioner's determination is presumptively correct, and the burden of proof is again upon the taxpayer to show error in such determination, *Stevens, supra*; Dunn v. Commissioner, 42 T.C. 490 (1964).

■ Expert testimony was offered both by plaintiffs and by the Government in support of their respective computations. There is no need for recapitulation of that testimony, inasmuch as, based upon the tests of Treas.Regs. 1.167 (a)–1(b) and upon the totality of the evidence, the Court finds the thirty year useful life to be much more realistic under the circumstances of this case. The automobile industry is an extremely fluid and innovative one, where not only have great changes occurred in design, size, etc., necessitating new sales and service facilities, but where there exists a likelihood that new power and fuel sources may contribute further to the swift obsolescence of plants such as that owned by plaintiffs. *Cf.* Atlas Storage Co. v. United States, 306 F.Supp. 570, 582 (S.D.W.Va.1969). Accordingly, considering exhaustion, wear and tear, and obsolescence, the useful life of the Company building to the Company in its business is no more than thirty years. *See generally* Portland Gen. Electric Co. v. United States, 223 F.Supp. 111, 113 (D.Ore.1963).

These will constitute the Court's Findings of Fact and Conclusions of Law. Counsel are instructed to submit to the Court, within twenty (20) days of entry of this Order, an appropriate judgment consistent therewith.