MURRAY G. AND ESTHER G. GURENTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent JAMES S. AND VIVIAN J. EZELL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gurentz v. Commissioner
Docket Nos. 6412-76 and 6515-76.
United States Tax Court
T.C. Memo 1978-238; 1978 Tax Ct. Memo LEXIS 282; 37 T.C.M. (CCH) 1027; T.C.M. (RIA) 78238; June 26, 1978, Filed Ronald M. Mankoff,Robert Edwin Davis, for the petitioners. Raymond L. Collins, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined the following deficiencies in petitioners' Federal income tax: Petitioner
Year
Deficiency
Murray G. and Esther G. Gurentz
1973
$ 3,558.96
James S. and Vivian J. Ezell
1973
15,392.18
James S. and Vivian J. Ezell
1974
26,297.10
These cases have been consolidated for purposes of trial, briefing and decision. The issues for decision are: 1. Whether Central State Trucking Co., Inc., petitioner's electing small business corporation, is entitled to deduct under section 166(c)[1] additions to its reserve for bad debts for its years ending 1973 and 1974; and 2. Whether undistributed taxable income of Central State Trucking Co., Inc., which petitioners Ezell reported as earned income in 1973 and 1974 is subject to the maximum tax limitations provided in section 1348. *284 FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. At the time they filed their petitions, all petitioners were residents of Dallas, Texas. Esther Gurentz and Vivian Ezell are parties only by virtue of having filed joint returns with their husbands. When we hereafter refer to petitioners, we will be referring to Murray Gurentz and James Ezell. In the 1950s petitioners formed Central State Trucking Co., Inc. ("Central State") which was in the business of buying and selling poultry, poultry by-products, and other meat products. Petitioners were equal owners of the stock of Central State until January 31, 1974, at which time Gurentz sold his Central State stock to Ezell. During the years in issue, Ezell was President and Gurentz was Vice-President of Central State. Ezell ran the day-to-day trading business of Central State, while Gurentz handled the financial and credit aspects of the business. Gurentz's services were not as valuable to Central State as those performed by Ezell. During the years in issue, Central State was an electing small business corporation (a "subchapter S" corporation) with a fiscal year ending September *285 30. For its fiscal year ending September 30, 1973, Central State paid each petitioner a $ 65,000 salary. For its fiscal year ending September 30, 1974, Central State paid salaries of $ 95,000 to Ezell and $ 48,000 to Gurentz. These were reasonable salaries. Central State had undistributed taxable income of $ 123,606.86 and $ 169,243.51 for its fiscal years 1973 and 1974, respectively. From 1970 to 1973 Central State's sales increased rapidly. [2] The business of Central State primarily involved buying and selling poultry and poultry by-products. Central State purchased fryer necks and backs from poultry processors and sold them to pet food manufacturers. The usual minimum purchase was one carload, or approximately 40,000 pounds of chicken parts. In early 1973 chicken parts cost approximately five cents per pound, or $ 2,000 a carload. By the end of 1973 the price had risen to 20 cents per pound, or $ 8,000 per carload. Normally Central State's transactions involved more than one carload. One transaction involved 200 carloads. All the trading was done by Ezell. *286 Some of the companies to which Central State sold chicken parts during the years in question were "one man" shops. At the end of fiscal 1973, for example, Central State had accounts receivable of $ 52,200.20 from Chester Frantz and $ 9,360 from Rio Foods, both "one man" operations. Similarly, at the end of fiscal 1974, Central State had accounts receivable of $ 3,479.45 from Rio Foods and $ 15,375 from Poultry Foods (another "one man" operation). These "one man" operations probably would be unable to pay their debts if anything happened to the individual in charge. [3] The bulk of Central State's business, however, was with large companies like Quaker Oats and Star Kist. These large accounts comprised the greater percentage of Central State's accounts receivable during the fiscal years in question. [4]
Central State's rapid increase in sales was *287 matched by a rapid increase in its accounts receivable. Receivables as of the end of its fiscal year climbed from $ 49,536 in 1970 to $ 363,454 in 1973. In the recession of 1974 both sales and receivables declined slightly: receivables at the end of Central State's fiscal year 1974 were $ 341,397. [5]
*288 Despite its large accounts receivable, Central State had an excellent record of debt collection. From fiscal 1968 through fiscal 1976 Central State incurred bad debts in only two years, $ 41,345.81 in fiscal 1970 and $ 33,000 in fiscal 1976. The 1970 amount of $ 41,345.81 consisted of the following specific accounts receivable: W.S. Distributing Co., $ 40,190.55; John S. Sneed Co., $ 410.41; R.W. Zant, $ 483.25; H.J. Heinz Co., $ 261.60. The fiscal 1976 bad debt was $ 33,000 owed by Rio Foods. Both W.S. Distributing Co. and Rio Foods were "one man" operations. Central State employed the accrual method of accounting and utilized the reserve method for deducting losses from bad debts during the years in issue. The closing reserves for bad debts (rounded to the nearest dollar, after additions have been made) were as follows from fiscal 1968 through fiscal 1976: 1968
$ 8,195.00
1969
$ 8,880.00
1970
$ 4,990.00
1971
$ 6,451.00
1972
$ 7,838.00
1973
$ 18,354.00
1974
$ 25,182.00
1975
$ 25,182.00
1976
$ 11,705.00
The reductions in the reserve in 1970 and 1976 occurred when Central State "deducted" the bad debts mentioned above from the reserve. *289 On its Small Business Corporation returns, Central State claimed deductions for additions to its reserve for bad debts of $ 10,515.47 in fiscal 1973 and $ 6,827.96 in fiscal 1974. Central State obtained the figure for 1973 through use of the so-called Black Motor Company formula; [6] under this formula, the bad debt reserve equals a percentage of the current year-end accounts receivable. The percentage is determined by dividing the total net bad debts for the current year and five preceding years by the total year-end accounts receivable for those years. [7] The addition to the reserve is the difference between the amount of reserve as determined under the formula and the amount in the reserve at year end. In 1974 Central State employed a new accountant (a national accounting firm) which recommended that Central State compute its reserve by adding (on an annual basis) to its reserve for bad debts an amount equal to 2 percent of accounts receivable at the end of its fiscal year. Central State used this method in fiscal 1974. Had Central State used the Black Motor Company formula in fiscal 1974, there would have been no addition to the reserve. *290 Since Central State was an electing Small Business Corporation during the years in issue, Gurentz and Ezell, its two shareholders, reported its undistributed taxable income on their tax returns. Ezell reported $ 61,803.43 in 1973 and $ 142,435 in 1974, and Gurentz reported $ 61,803.43 in 1973 and $ 26,808.46 in 1974. Gurentz received the same amount as Ezell in 1973 because they were equal shareholders of Central State then. However, Gurentz sold all his shares to Ezell on January 31, 1974. Gurentz owned one-half of Central State's shares for 1/3 of its taxable year ending September 30, 1974; he reported approximately 1/6 of its undistributed taxable income that year. Both Gurentz and Ezell reported their shares of Central State's undistributed taxable income as "income other than wages;" however, Ezell claimed in both years that his share of Central State's undistributed taxable income was subject to the maximum tax on earned income provided in section 1348. In the statutory notices sent to Ezell and Gurentz, respondent determined that Central State was not entitled to any additions to its reserve for bad debts for either of the fiscal years in issue. As a result of this *291 determination, the undistributed taxable income of Central State was increased in both years. In the statutory notice respondent sent to Ezell, respondent further determined that income in the amounts of $ 61,803.43 in 1973 and $ 142,435 in 1974 that Ezell reported as earned income was not earned income subject to the maximum tax provisions of section 1348. OPINION I. Bad Debt Reserves.
The first issue is whether Central State Trucking Co., Inc. ("Central State"), a subchapter S corporation, is entitled to a deduction under section 166(c) for additions made to its reserve for bad debts in fiscal 1973 and fiscal 1974. Respondent disallowed in their entirety Central State's deductions for additions to its reserve for bad debts of $ 10,515.47 in fiscal 1973 and $ 6,827.96 in fiscal 1974. In order for petitioners to prevail, they must prove that the amount of Central State's addition to their reserve in each of the years in issue was reasonable and that, in disallowing any additions to the reserve, respondent abused his discretion. Patterson v. Pizitz, Inc.,353 F. 2d 267 (5th Cir. 1965); Westchester Development Co. v. Commissioner,63 T.C. 198 (1974); *292 Roanoke Vending Exchange, Inc. v. Commissioner,40 T.C. 735, 741 (1963). Section 166(c) provides that in lieu of specific deductions for bad debts, "there shall be allowed (in the discretion of the Secretary or his delegate) a deduction for a reasonable addition to a reserve for bad debts." A "reasonable" addition is described in section 1.166-4(b)(1), Income Tax Regs., as follows: Relevant factors. What constitutes a reasonable addition to a reserve for bad debts shall be determined in light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve. In fiscal 1973 Central State computed its addition to the reserve by using the Black Motor Company[8] formula. *293 This formula uses a 6-year moving average, taking the ratio of the average of the receivables which were outstanding at the end of the year plus those outstanding the preceding five years to the average of the debts actually charged off during the same 6-year period. This ratio is then multiplied by the receivables outstanding at the end of the current year. The result is a figure, based entirely on past experience, which forms a maximum limit on the size of the reserve which may not be exceeded by the year-end addition. Central State's calculation of its year-end reserve, using the Black Motor Company formula, is set forth in footnote 7, supra. Respondent disallowed the entire addition to the reserve. We conclude that in fiscal 1973 Central State's addition to the reserve was reasonable and that respondent abused his discretion in disallowing it. Central State relied on the Black Motor Company formula to obtain the amount of the deductible addition to its bad debt reserve. Respondent has acknowledged that this formula is the *294 most widely used formula for determining the appropriate addition to a bad debt reserve, and respondent generally employs this formula to determine a taxpayer's allowable reserve for bad debts. See Rev. Rul. 76-362, 1976-2 C.B. 45. We recognize that the Black Motor Company formula does not provide the exclusive formula for determining the deductible addition to a reserve, and that "[a] formula which may have produced a reasonable addition over a series of years might very well prove inadequate under the circumstances attendant upon the year involved." R. Gsell & Co. v. Commissioner,34 T.C. 41, 56 (1960), revd. on other grounds 294 F. 2d 321 (2d Cir. 1961). Nevertheless, we conclude under the facts of this case that the use of the Black Motor Company formula in 1973 produced a reasonable result. Central State's year-end reserve was $ 7,834.97 in fiscal 1972, and the claimed addition in fiscal 1973 raised the year-end reserve to $ 18,354.44.This addition was appropriate since Central State's annual sales grew in one year from $ 1,869,884 to $ 4,227,883 and its year-end accounts receivable grew from $ 138,804 to $ 363,454.Moreover, *295 two of these 1973 year-end accounts receivable were debts owed by "one man" shops and therefore were more susceptible to default then debts of large, publicly held corporations. [9] In addition, the cost of the poultry traded had increased from 5 cents per pound to 20 cents per pound, so that the cost per carload had increased from approximately $ 2,000 to $ 8,000. Since Central State's trades were in carload lots, this increase in prices made it likely that even a single default would exceed the amount of Central State's previous reserve. In addition, two expert witnesses testified that the addition to the reserve was reasonable. In fact, both experts concluded that the addition was, if anything, too small given the increase in accounts receivable, the volatility of the business, the number of accounts with "one man" shops, and the general price instability during the years in issue. Respondent contends that the addition was not reasonable. Respondent points out that all the accounts receivable at year-end were in fact collected within several weeks of the end of fiscal *296 1973. Central State had a remarkable and enviable record of collecting its debts. Respondent's contention that none of the debts were in fact bad, however, misses the basic point that the reserve is meant to be only an estimate. The net effect of respondent's contention is to negate the distinction between the reserve method and the specific charge-off method of accounting for bad debts. Moreover, respondent relies on events which occurred after the close of the year which is contrary to Reg. section 1.166-4(b)-1, supra, and impermissible. See Westchester Development Co.,supra at 212. Second, respondent contends that Central State did not need an addition to its reserve for bad debts since most of its customers were large, solvent corporations. However, some of the accounts receivable which Central State had outstanding on September 30, 1973, were from "one man" shops. The outstanding balance of these accounts exceeded Central State's year-end reserve for bad debts. Although hindsight proves that these debts did not become uncollectible, petitioner was justified in viewing these accounts as volatile. Respondent contends, third, that Central State *297 had an excellent debt collection record and that it had, in fact, incurred no bad debts in the two preceding years.We believe that this argument is misplaced, since the Black Motor Company formula used by Central State fully accounts for variances in debt collection over a 6-year period. Finally, respondent contends that the use of the Black Motor Company formula led to an unreasonable result since the $ 40,190.55 bad debt incurred in 1970 was the result of a "swindle" and was unusually large. However, the evidence presented does not indicate that Central State was "swindled"; it merely shows that the purchaser had not defaulted on prior small purchases but became bankrupt prior to paying for this large purchase. Moreover, this account was not inordinately large compared to Central State's other receivables.
Having concluded that the addition to its reserve which Central State claimed in fiscal 1973 was reasonable, we now turn to the question whether respondent's disallowance of the addition was arbitrary and an abuse of discretion. See Krim-Ko Corp. v. Commissioner,16 T.C. 31 (1951). Respondent's determination was based on an erroneous assumption made *298 by his agent. The revenue agent disallowed Central State's claimed addition because he erroneously believed that the debt of $ 40,190.55 incurred in 1970 should not be used in the Black Motor Company computation. He believed inclusion would give Central State a "double benefit" from the loss.At trial respondent disavowed the revenue agent's position, but continued to argue that he had not abused his discretion in disallowing any addition to the reserve for bad debts.
Respondent's determination in this case gives little heed to the changes which occurred in Central State's business.Although Central State's accounts receivable had greatly increased, respondent determined that Central State was not entitled to increase its reserve for bad debts. Respondent's disregard of a taxpayer's changed circumstances can constitute an abuse of discretion. Richardson v. United States,330 F. Supp. 102 (S.D. Tex. 1971). See also Westchester Development Co.,supra at 212; Thor Power Tool Co. v. Commissioner,64 T.C. 154, 174-175 (1975), affd. 563 F. 2d 861 (7th Cir. 1977), cert. granted (Mar. 6, 1978). In light of the reasonableness *299 of Central State's addition to its reserve, respondent's disregard of Central State's changed circumstances, and the agent's error in applying the Black Motor Company formula, we conclude that petitioners have met their heavy burden of proof that respondent abused his discretion and that Central State is entitled to the claimed addition to its reserve for bad debts in fiscal 1973. For fiscal 1974, however, we reach a different conclusion. Again, petitioners have a heavy burden of proof--they must prove not only that the addition was reasonable but also that respondent's adjustment was an abuse of discretion. Because we do not find an abuse of discretion in this year, we do not consider the reasonableness of the addition claimed in fiscal 1974. In fiscal 1974 Central State changed accountants and began to use the services of a national accounting firm. That firm recommended that Central State change the method by which it computed its reserve for bad debts; the new method provided an annual addition to its reserve of two percent of year-end accounts receivable. Central State adopted this method and claimed a deduction for the resulting addition to its reserve for bad debts *300 in fiscal 1974. We find no circumstances which indicate that respondent abused his discretion. Had Central State continued to apply the Black Motor Company formula, there would not have been any addition to the reserve in fiscal 1974. The reason is that Central State's accounts receivable as of September 30, 1974, were $ 341,397, $ 22,057 less than the accounts receivable of a year before, and Central State had incurred no bad debts during the intervening year. We conclude that respondent did not abuse his discretion, see Thor Power Tool Co. v. Commissioner,supra, at 174-175, and hold for respondent with respect to fiscal 1974. II. Maximum Tax. The next issue is whether undistributed taxable income of Central State, which Ezell reported as earned income on his returns for 1973 and 1974, is subject to the maximum tax limitation provided in section 1348. Section 1348 limits the tax imposed on earned income, which is defined in section 1348(b)(1) as "earned income within the meaning of section 401(c)(2)(C), or section 911(b) * * *." Ezell concedes that *301 section 401(c)(2)(C) does not apply to his circumstances. Accordingly, we refer to section 911(b), which defines earned income as follows: For purposes of this section, the term "earned income" means wages, salaries, or professional fees, and other amounts received as compensation for personal services actually rendered, but does not include that part of the compensation derived by the taxpayer for personal services rendered by him to a corporation which represents a distribution of earnings or profits rather than a reasonable allowance as compensation for the personal services actually rendered. In the case of a taxpayer engaged in a trade or business in which both personal services and capital are material income-producing factors, under regulations prescribed by the Secretary or his delegate, a reasonable allowance as compensation for the personal services rendered by the taxpayer, not in excess of 30 percent of his share of the net profits of such trade or business, shall be considered as earned income. *302 Section 1.1348-3(a)(1)(i), Income Tax Regs., states: The term [earned income] does not include such income as dividends (including an amount treated as a dividend by reason of section 1373(b) and section 1.1373-1), other distributions of corporate earnings and profits, * * * or gains which are treated as capital gains under any provision of chapter 1.
Section 1373(b) provides that the undistributed taxable income of a subchapter S corporation is treated as a dividend to its shareholders. Accordingly, this regulation concludes that undistributed taxable income is not subject to the maximum tax on earned income. This regulation was adopted on December 12, 1976, by T.D. 7446, 1977-3 I.R.B. 13. In this case Ezell received as salary $ 65,000 in 1973 and $ 95,000 in 1974, which respondent concedes was a reasonable salary. Central State's undistributed taxable income was allocated equally to its two shareholders in 1973 and apparently stock ownership was the basis of its allocation in 1974 as well. Ezell contends, however, that the undistributed taxable *303 income was meant to be compensation to him for services rendered; Ezell points especially to Gurentz's testimony to that effect.Since the undistributed taxable income apparently represents Central State's earnings and profits, Ezell contends that we should look to the substance of the undistributed taxable income rather than its form. The facts of this case strongly indicate that the undistributed taxable income was allocated with respect to the stock of the corporation, not with respect to services provided. In 1973 Gurentz reported undistributed taxable income equal to that reported by Ezell, yet Gurentz admitted that he did not perform equal services.Rather, the basis for an equal distribution was equal ownership of the stock of Central State. Gurentz owned one-half of Central State's stock for four months of its fiscal year ending September 30, 1974, and he reported approximately one-sixth of its undistributed taxable income. This amount apparently represents his time of ownership (one-third of the year) times his percentage ownership (one-half) of Central State. On the facts of this case we must conclude that the undistributed taxable income represents a distribution of *304 Central State's earnings and profits, not compensation for services. This case is indistinguishable from Migliore v. Commissioner,36 TCM 1004, 1977 P-H Memo. T.C. par. 77,247 (1977). In Migliore the taxpayer reported undistributed taxable income from their small business corporation; we held that this income was not subject to the maximum tax on earned income. Ezell contends, however, that Migliore is factually distinguishable. In Migliore we stated: While we might be inclined to go along with petitioners' substance over form argument in the area of section 1348, petitioners have failed to lay the necessary factual foundation for such an argument. That is, petitioners have failed to show that the dividends received, actually or constructively, were paid to them in lieu of reasonable compensation. 36 TCM at 1007, 1977 P-H Memo. T.C. at 77-1007. Ezell contends that he has laid the necessary factual foundation. We disagree. Ezell received reasonable compensation from Central State by means of a salary of $ 65,000 in 1973 and $ 95,000 in 1974. In addition, as we noted above, the fact that both Ezell and Gurentz received equal amounts *305 of undistributed taxable income for unequal services rendered negates Ezell's contention that the undistributed taxable income was, in fact, compensation. Rather the undistributed taxable income was allocated (as earnings and profits) on the basis of stock ownership. Accordingly, we hold that the undistributed taxable income reported by Ezell is not subject to the maximum tax limitation provided by section 1348. Decisions will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
2. Central State's sales from fiscal 1968 through fiscal 1976 were as follows: ↩
1968
$ 1,756,785
1969
$ 1,375,389
1970
$ 869,548
1971
$ 1,272,301
1972
$ 1,869,984
1973
$ 4,227,883
1974
$ 3,805,209
1975
$ 2,570,909
1976
$ 3,518,733 $ 3. Chester Frantz was approximately 70 years old; the man in charge of Poultry Foods was in poor health. ↩
4. E.g., the accounts receivable from major purchasers (Quaker Oats, Star Kist, Lowrey's) constituted 83 and 94 percent of Central State's accounts receivable as of September 30, 1973, and September 30, 1974, respectively.↩
5. Central State's accounts receivable at the end of its fiscal years from 1968 through 1976 were as follows: 1968
$ 52,680.00
1969
$ 68,579.00
1970
$ 49,536.00
1971
$ 146,018.00
1972
$ 138,804.00
1973
$ 363,454.00
1974
$ 341,397.00
1975
$ 118,627.00
1976
$ 311,290.00
The specific accounts receivable as of September 30, 1973, and 1974, were as follows: ↩
September 30, 1973 Account
Balance
Date of Payment
Steve Bodner
$ 1,722.00
10/11/73
Chester B. Frantz
52,200.20
10/09/73
Lowreys Friskies, Inc.
59,039.00
10/02/73
Mike Dipp-Rio Foods
9,360.00
10/02/73
Quaker Oats Foods
159,016.96
10/02/73
Star Kist Foods
82,116.05
10/1/73 to
10/9/73
Total
$ 363,454.21
September 30, 1974
Rio Foods
$ 3,479.45
10/10/74
Lowreys
55,301.40
10/07/74
Star Kist Foods
61,763.25
10/1/74
Poultry Foods
15,375.00
10/7/74
Quaker Oats
205,478.70
10/1/74 to
10/18/74
Total
$ 341,397.80
6. This formula is derived from Black Motor Company v. Commissioner,41 B.T.A. 300 (1940), affd. 125 F. 2d 977↩ (6th Cir. 1942). 7. For example, Central State's calculation for fiscal 1973 using the Black Motor Company formula was as follows: Accounts Receivable Fiscal Years
on September 30
Bad Debt
Recovery
1968
$ 52,680.61
0
0
1969
68,579.89
0
0
1970
49,536.76
$ 41,345.81
0
1971
146,018.35
0
0
1972
138,804.78
0
0
1973
363,454.21
0
0
Six Vr. Total
$ 819,074.60
$ 41,345.81
0
AVERAGE
$ 136,512.43
$ 6,890.96
0
↩
1. % Average Loss $ 6,890.96 / $ 136,512.43 = 5.05%
2. 5.05% of $ 363,454.21
$ 18,354.44
Total Reserve
Requirement
3. Less Reserve on Sept. 30, 1973
-7,838.97
4. Addition to Reserve
$ 10,515.47
8. Black Motor Company v. Commissioner,41 B.T.A. 300 (1940), affd. 125 F. 2d 977↩ (6th Cir. 1942).
9. Central State was owed $ 9,360 by Rio Foods and $ 52,200.20 by Chester Frantz, both "one man" shops.↩