**CALAVO, INC., and Calavo Growers of California, Successor to Assets and Liabilities of Calavo, Inc., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17345.

United States Court of Appeals Ninth Circuit.

May 25, 1962.

---

Goodson & Hannam, Bruce I. Hochman, and Avram Salkin, Los Angeles, Cal., for appellant.

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Robert N. Anderson, Earl J. Silbert, and Harold M. Seidel, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before BARNES, MERRILL and BROWNING, Circuit Judges.

MERRILL, Circuit Judge.

This case presents the question whether additions to a bad debt reserve may be made on the basis of circumstances rendering precarious (but not yet worthless) a specific item of indebtedness. The commissioner, ruling that such additions to reserve were not reasonable, determined deficiencies in income tax of Calavo, Inc., for the taxable years ending September 30, 1953, and September 30, 1955. The Tax Court upheld the commissioner and the taxpayer has petitioned for review.

Calavo Growers of California is a California corporation composed of avocado growers operating on a cooperative basis. Calavo, Inc., was a California corporation during and prior to the year 1955 and was a wholly owned subsidiary of Calavo Growers. It was engaged in the business of marketing the produce of its parent corporation and it also operated as commission sales agent for various other growers and shippers, selling pineapples, limes, dates, figs, and other produce in addition to avocados. It kept its books on an accrual method of accounting.

On September 30, 1955, a statutory merger (a non-taxable transaction under § 332(a) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 332(a), was effectuated pursuant to California law by which Calavo Growers succeeded to the assets and liabilities of Calavo, Inc. Thereafter, Calavo Growers continued the business of Calavo, Inc., and the consolidated balance sheet of both organizations as of September 30, 1955, became the new balance sheet of Calavo Growers. On its books Calavo Growers thereafter carried all accounts of Calavo, Inc., for which the latter had set up a reserve for bad debts.

A. C. Duarte, Inc., a Cuban corporation, had been a large supplier of produce to Calavo, Inc. Commencing in 1954, Calavo, Inc., advanced substantial sums to Duarte in order that it might expand its operations in Cuba, particularly with respect to pineapples. As a consequence, on September 30, 1955, Duarte owed Calavo, Inc., $42,744.39.

During the summer of 1955, Calavo, Inc., became concerned about the collectibility of the Duarte account. The price of pineapples had declined with the result that after expenses very little was left from the sales of Duarte's shipments to apply upon its account. Calavo, Inc., debated whether further advances should be made and it was at first decided that the risk should be taken with the hope that recoupment of advances could be realized. In August, 1955, however, it was decided that no further money should be risked.

In November, 1955, Calavo's Cuban attorneys advised that investigation reveal-

ed that Duarte was insolvent; that it had offered its creditors fifty per cent payment and that there was doubt that it could live up to this proposal. This doubt was confirmed by further investigation in November and December, 1955. Ultimately in 1959, $4,488.59 was recovered and was the total extent of recovery.

Calavo, Inc., maintained a reserve for bad debts and this was carried over into the merged corporation. For the years 1951 through 1954 the reserve was maintained at $11,000.00. During these years additions to reserve equalled the amounts charged against reserve for debts which had become worthless during the years. The annual loss (and addition to reserve) averaged slightly less than $4,000.00.

For the taxable year ending September 30, 1955, the audit of Calavo, Inc.'s books was completed by its auditors in November, 1955. It was decided to increase the reserve for bad debts by adding the sum of $50,000.00 over and above the $11,000.00 level theretofore maintained. Losses in the sum of $2,183.80 had been suffered during the year and were charged off against the reserve. An addition to reserve was therefore made in the sum of $52,183.80, bringing the reserve to the figure of $61,000.00. No portion of the Duarte account was charged against the reserve as having become worthless during the year.

On January 11, 1956, a return was filed for Calavo, Inc., reflecting this addition to reserve. Also filed was an application for carry-back adjustment for the taxable year ending September 30, 1953. This adjustment was tentatively allowed by the commissioner.

By the deficiency notices subsequently given for both taxable years, the commissioner restored to income the entire $61,000.00 reserve on the ground that Calavo, Inc., was liquidated and dissolved at that time and that the need for the reserve thus had ceased. Before the Tax Court, however, the commissioner conceded that this was error and that such reserve was not restored income in the case of a § 332(a) reorganization. Before the Tax Court, the position taken by the commis-

sioner was that the additions to reserve were in their entirety to be disallowed as unreasonable; that $8,816.20 ($11,000.00 less the amounts charged off against the reserve during the taxable year) constituted an adequate reserve. It was this determination which was upheld by the Tax Court and which is before us on review.

Upon the merits the dispute relates to the extent to which the circumstances particularly affecting the Duarte account must be taken into consideration in allowing additions to the reserve. Before we reach this problem, however, a preliminary contention of the taxpayer must be disposed of.

Taxpayer contends that the reasonableness of the addition to reserve has been established as matter of law since the commissioner before the Tax Court failed to show the addition to be unreasonable. Taxpayer, in justification of the addition, presented testimony that this sum was added after all accounts with its shippers had been appraised and that it represented a composite of its appraisals. The Tax Court deals with this contention in the following language:

"The testimony of Hodgkin, manager of Calavo, Inc., was to the effect that in view of the trouble Calavo, Inc. was experiencing in collecting this particular account consideration was given to all other accounts of this nature and that it was decided that a proper addition on account of this and other similar accounts should be $50,000. Actually there was no evidence presented as to how many such accounts there were or what amount had been advanced to others. Nor does the record disclose anything about the financial condition of such other shippers or the types of produce which they furnished. The only direct evidence as to uncollectibility of any amounts advanced to shippers relates solely to the amount advanced to Duarte, Inc."

Later the court reiterates:

"Furthermore, as has been indicated hereinabove, there has been no

showing that the reserve should be increased because of any existing conditions affecting the collectibility of any other advances of this nature. As stated, Calavo, Inc. had had no bad debt experience with respect to similar accounts."

Taxpayer protests that the Tax Court improperly imposed upon it the burden of proof, as appears from the following language of the court:

"Section 23(k) (1) of the 1939 Code [26 U.S.C.A. § 23(k) (1)] permits a deduction from income, in the discretion of the Commissioner, of a reasonable addition to a reserve for bad debts. Great latitude is extended the Commissioner in exercising that discretion; and the burden of establishing an abuse of discretion falls heavily upon the taxpayer. Union National Bank & Trust Co. of Elgin, 26 T.C. 537 (1956)."

Taxpayer contends that the Tax Court was in error in according the commissioner's determination any presumption of correctness, since that determination dealt solely with a restoration to income of the entire reserve, a concededly erroneous determination, and did not deal with the reasonableness of additions to reserve.

■ But, as the commissioner here points out, the Tax Court, in referring to the taxpayer's burden, was not concerned with the presumption of validity of the commissioner's original determination. It was concerned with the discretion, specifically vested in the commissioner by § 166(c) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 166(c), to allow reasonable additions to reserve. A prima facie case is made by the commissioner in showing his exercise of discretion in this area. The burden is upon the taxpayer to overcome this prima facie case by demonstrating the reasonableness of the additions which the commissioner had refused to allow.[1]

The taxpayer asserts that the commissioner never exercised his discretion in this area. It is true that such exercise of discretion was not evident from the notice of deficiency, but we do not feel that this is the only manner in which discretion in this area may be exercised. Before the tax court, from the outset, it was understood that the commissioner, as an alternative to his position upon the restoration-to-income issue, contended that the additions were unreasonable.[2]

■■ We conclude that the Tax Court was not in error in imposing a burden on

---

[1.] This is a different burden than that imposed upon the commissioner when new matter is pleaded in the answer. Tax Court, Rule 32, 26 U.S.C.A.

[2.] The stipulation of facts before the Tax Court reads in part:

"The following facts are hereby stipulated by and between petitioners and respondent upon the express understanding that at the time of trial evidence may be adduced either orally or by written documentation with respect to the issue of the reasonableness of the Bad Debt allowance or with regard to any other matter * * *."

In its opening statement to the Tax Court, counsel for the taxpayer stated:

"Now, the principal issues involved before the Court involve one of law and, I believe, one of fact. * * *

"The issue of fact, perhaps a little more complex and always subject to hindsight judgment is simply that the management of Calavo, Inc. acted reasonably under all the circumstances known to them at the time and set up a reasonable reserve for bad debt.

"Hindsight can perhaps be difficult in these types of situations, but the problem, I think, before the Court is whether or not before September 1955 for that return was the account reasonable, was it not reasonable."

The government in response stated:

"It is the further position or alternative position of respondent that even if they were able to show the justification for a reserve, the reserve in the amount claimed was unreasonable."

Finally, in the taxpayer's reply brief in this court it was stated:

"Petitioner was neither alarmed nor surprised at the fact that the reasonableness of the addition to its reserve for bad debts would be questioned in the Tax Court Proceeding. In fact, such an attack was anticipated, and for that reason, was met at all stages of the proceeding, including the stipulation of facts, opening argument, and presentation of the case."

the taxpayer to show abuse of discretion and that its determination that that burden had not been met as to any accounts other than Duarte was not clearly erroneous.

We arrive then at the principal question presented by this review: the extent to which the circumstances particularly affecting the Duarte account must be taken into consideration in allowing additions to taxpayer's bad debt reserve.

The commissioner contends that they may not be taken into consideration at all until such time as the debt has become worthless in whole or in part and only to the extent that it is charged off as worthless against the reserve.[3] The Tax Court in this respect stated:

"Under the reserve method, losses on individual accounts are not deductible. Any debts which become worthless during the taxable year are chargeable against the reserve, resulting in a reduction thereof. There is then allowed as a deduction the proper amount representing an addition to the reserve necessary to bring the balance in the reserve to an amount which can be reasonably expected to cover anticipated losses on the accounts outstanding at the end of the year. It is only in this manner that specific accounts which become bad may affect the reasonable addition to the reserve which the tax-payer is entitled to deduct. However, no specific debt is taken into account even in this indirect manner unless it becomes worthless during the taxable year in question."

■■ It is clear that debts may not be charged off against the reserve until they have become worthless. It does not follow, however, that the circumstances particularly affecting a specific debt must be completely disregarded in determining the reasonableness of additions to reserve. Since the reserve normally is dealing with unknown factors bearing upon unidentifiable accounts, its reasonable extent is ordinarily calculated by resort to past experience with such accounts in the composite. But the fact that experience is the guide in dealing with unknown factors and unidentifiable accounts should not require us to reject the more accurate guidance of known factors bearing upon identifiable accounts when such information is available. The extent of a reasonable reserve should depend upon an adjustment between known circumstances and experience.[4]

It is in the making of this adjustment that the discretion of the commissioner operates in cases such as this. The question upon review is whether the result amounts to an abuse of discretion. As the Tax Court noted, the burden of establishing such abuse falls heavily upon the taxpayer.

3. Neither case law nor legislative history is helpful upon this proposition. We are cited only to cases of the Tax Court, which appears to have divided on this proposition. The following cases appear to uphold the proposition asserted by the commissioner here: Houston Chronical Publishing Company, 1944, 3 T.C. 1233; New York Water Service Corporation, 1949, 12 T.C. 780; H. Wolff Book Manufacturing Company, 19 P-H Tax Ct. Mem. 903 (1950). The following cases appear contra: Stockton Morris Plan Company, 12 P-H Tax Ct. Mem. 1025 (1943); and R. Gsell Company v. Commissioner of Internal Revenue, 34 T.C. 41, reversed on other grounds, 291 F.2d 324 (2d Cir., 1961). See testimony of Dr. Adams in, Hearings before Senate Committee on Finance, 67th Congress, 1st Session, 52,3 (1921).

4. The Tax Court in its opinion in this case has recognized this in the following language:
  "While the reasonableness of an addition to the reserve ordinarily will be judged in the light of the taxpayer's experience in collecting its accounts, no hard and fast standard should be adopted. A formula which may have produced a reasonable addition over a series of years might very well prove inadequate under the circumstances attendant upon the year involved. Black Motor Co., 41 B.T.A. 300 (1940), affd. 125 F.2d 977 (C.A. 6, 1942). In the final analysis, the estimate as to the reserve required for any given year will be measured in light of the conditions which exist at the time the estimate is made."

The taxpayer appears to have approached the problem of additions to reserve purely from the point of view of balance sheet accounting—of so evaluating assets as to make the balance sheet reflect the best possible estimate of actual worth.

This approach, however, while wholly proper in its place, frequently works at cross-purposes to a taxing system which operates on an annual accounting basis. The balance sheet approach may well result in a charge to the income account which bears no relation to the income producing activities of the period involved.[5]

So here, save as to advances made to Duarte during the taxable year, additions to reserve based upon that account can hardly relate to the taxpayer's income-producing activities during that year.

The commissioner in the past has undoubtedly permitted some consideration of balance sheet factors as properly applicable to income accounting.[6] However, the extent to which this is to be permitted when the result is inconsistent with annual income accounting must be left to the discretion of the commissioner so long as that discretion does not appear to have been arbitrarily or discriminatorily exercised.

Even where, as here, some advances to Duarte (in an amount not disclosed in the record) were made within the taxable year (and, to the extent of such advances, consideration of the specific circumstances bearing upon that account is consistent with annual income accounting) the exercise of discretion by the commissioner should not be superseded by a rule of law as to the degree of consideration which must be given. Such a rule, at best, would create a most formidable and complex structure of tax law imposed upon the commissioner as mandatory in an area in which discretion now permits flexibility.[7]

■ The difficulty we face is that it is apparent that the commissioner has, in disallowing any addition to reserve, refused to give any consideration whatsoever to the circumstances affecting the Duarte account. His discretion has thus been exercised under a misapprehension as to the considerations upon which it should be based. This, we feel, requires a reconsideration by the commissioner of the question as to what under all of the circumstances would be a reasonable addition to reserve and a re-exercise of his discretion upon this question.

Reversed and remanded to the Tax Court with instructions that its judgment be vacated and that the cause upon the present record be resubmitted to the commissioner for an exercise of his discretion free from his erroneous conception that the circumstances particularly affecting a specific debt must be completely disregarded in determining the reasonableness of additions to reserve. To the extent that it is felt necessary in order to permit review of an exercise of discretion based on the principles stated in this opinion, the Tax Court may allow petitioners to supplement the record respecting the Duarte account.

---

5. "If the aging method is used, accounts may not appear to be uncollectible until a date subsequent to the period of sale; in that case the loss, or the provision therefor, will not be charged to income until a period subsequent to that of the sale. Thus, one period will get the credit for the income and a later period will get the charge for the loss." Finney & Miller, Principles of Accounting, Intermediate, 209 (5th Ed., 1958).

6. For example, the aging of receivables method, when applied to ordinary trade accounts, may produce results similar to those achieved by a percentage of sales.

7. For example, a structure in which, on the first tier, conditions satisfying the standards of "worthlessness" will permit a complete charge-off against reserve irrespective of the year in which the debt arose: while, on the second tier, conditions satisfying some lesser standard of dubious worth might justify some lesser deduction from income accomplished by adding to reserve that amount by which the debt, to the extent of advances made during the taxable year, is found to have lost value.