VALMONT INDUSTRIES, INC., A DELAWARE CORPORATION AND ITS CONSOLIDATED SUBSIDIARIES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4774–77.     Filed March 12, 1980.

*Robert V. Dwyer, Jr.,* for the petitioner.
*Leonard A. Hammes,* for the respondent.

WILES, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes:

| Taxable year | Deficiency |
|---|---|
| Jan. 1, 1972—Dec. 30, 1972 ............ | $128,030 |
| Dec. 31, 1972—Dec. 29, 1973 ............ | 133,238 |
| Dec. 30, 1973—Dec. 28, 1974 ............ | 179,947 |

After concessions, the remaining issues for decision are:

(1) Whether respondent abused his discretion under section 166(c)[1] by disallowing part of petitioner's addition to its bad debt reserve for the taxable years ended December 29, 1973, and December 28, 1974.

(2) Whether petitioner's two galvanizing facilities were eligible for the investment tax credit under section 38.

(3) Whether petitioner can depreciate its galvanizing facilities under the double declining balance method.

(4) Whether petitioner is entitled to depreciation and an investment tax credit on the initial zinc charge to its galvanizing kettles.

## FINDINGS OF FACT

Some facts were stipulated and are found accordingly.

Petitioner, a Delaware corporation and its consolidated subsidiaries, maintained its principal office in Valley, Nebr., when it filed its petition in this case. Petitioner filed consolidated corporate income tax returns for each of the taxable years ended December 30, 1972, December 29, 1973, and December 28, 1974, with the Internal Revenue Service Center, Ogden, Utah.

### Issue 1. Bad Debt Reserve

During the years at issue, petitioner was engaged in the manufacture and sale of center pivot irrigation systems, mechanical tubing and pipe, lighting standards and transmission poles. The irrigation systems were petitioner's principal product line accounting for 70 to 75 percent of its total business in 1974. In that year, petitioner sold its irrigation systems to approximately 80 to 100 dealers throughout the United States at a price of $20,000 to $25,000 per system. The lighting standards were sold to various public, private, and governmental entities. About 70 percent of petitioner's customers for lighting standards were electric utilities. Petitioner sold its entire line of products on open account and, except for its sales of irrigation systems, required no security from the purchasers.

In 1974, petitioner's sales of irrigation equipment increased dramatically. This rapid sales increase was matched by an equally substantial increase in petitioner's accounts receivable.

[1]All statutory references are to the Internal Revenue Code of 1954 as amended.

The trend in petitioner's accounts receivable outstanding from 1968 through 1975 was as follows:

| Year | Accounts receivable outstanding end of year |
|------|---------------------------------------------|
| 1968 | $1,859,979 |
| 1969 | 1,218,241 |
| 1970 | 1,787,675 |
| 1971 | 2,291,510 |
| 1972 | 4,212,213 |
| 1973 | 3,537,589 |
| 1974 | 7,694,769 |
| 1975 | 8,372,363 |

Faced with this increased exposure, petitioner, in 1974, secured the open account risk on its irrigation line with a blanket security filing pursuant to the Uniform Commercial Code. This filing allowed petitioner to retain title to the equipment until full payment was received. Also, in 1974, petitioner carried on its books approximately $339,000 for future cash discounts offered to customers as an inducement to pay their accounts.

At the close of 1974, approximately 15 to 20 customers each owed petitioner amounts in excess of $100,000. In addition, petitioner had receivables of $2,150,000 which were 30 days or more overdue and $373,000 of receivables which were 90 days or more overdue.

In February 1975, petitioner's credit manager, Lee Salmans, prepared a memorandum listing certain 1974 accounts as "doubtful." Many of these accounts were labeled as doubtful because of disputes with petitioner concerning workmanship defects and slow delivery of shipments. Salmans submitted this memorandum to petitioner's controller, Brian Stanley, for his use in preparing petitioner's 1974 income tax return. Most of these "doubtful" accounts were subsequently collected by petitioner.

Petitioner used the reserve method of accounting for bad debts under which it deducted the annual additions to the reserve. The following chart represents a breakdown of petitioner's bad debt reserve from 1968 through 1975:

| Year | Bad debt reserve at beginning of year | Amounts added to bad debt reserve | Amounts charged against bad debt reserve | Recoveries | Net amount charged after recoveries | Balance in bad debt reserve at end of year |
|---|---|---|---|---|---|---|
| 1968 | $28,129 | $26,283 | $17,910 | 0 | $17,910 | $36,502 |
| 1969 | 36,502 | 14,897 | 1,738 | 989 | 749 | 50,650 |
| 1970 | 50,650 | 68,092 | 68,000 | 1,500 | 66,500 | 52,242 |
| 1971 | 52,242 | 11,977 | 38,460 | 217 | 38,243 | 25,976 |
| 1972 | 25,976 | 57,446 | 11,394 | 672 | 10,722 | 72,700 |
| 1973 | 72,700 | 106,929 | 62,709 | 3,080 | 59,629 | 120,000 |
| 1974 | 120,000 | 203,710 | 12,034 | 5,324 | 6,710 | 317,000 |
| 1975 | 317,000 | ( [2] ) | 23,633 | 13,880 | 9,753 | ( [3] ) |

The amounts to be added to the reserve for 1974 were determined by Brian Stanley with the advice of a nationally known firm of certified public accountants whom petitioner had hired to audit its financial statements. Although he relied heavily upon the accounting firm's recommended reserve level, Stanley also made an independent examination of petitioner's bad debt posture. After reviewing all the factors which he considered to be relevant, Stanley concluded that a $317,000 reserve was appropriate for the end of fiscal 1974.

On its income tax returns for the fiscal years ended December 29, 1973, and December 28, 1974, petitioner deducted $106,929 and $203,710, respectively, as additions to its bad debt reserve. Respondent, after applying the *Black Motor Co.* formula,[4] determined that the additions for 1973 and 1974 were excessive to the extent of $74,011 and $175,275, respectively, and accordingly, disallowed those amounts in his notice of deficiency. Respondent's computations based upon the *Black Motor Co.* formula for 1973 were as follows:

| Fiscal year | Outstanding receivables | Bad debt (net) | Ratio of losses |
|---|---|---|---|
| 1968 | $1,859,979 | $17,910 | 0.96% |
| 1969 | 1,218,241 | 749 | 0.06% |
| 1970 | 1,787,675 | 66,500 | 3.72% |
| 1971 | 2,291,510 | 38,243 | 1.67% |
| 1972 | 4,212,213 | 10,722 | 0.25% |
| 1973 | 3,537,589 | 59,629 | 1.69% |
| | 14,907,207 | 193,753 | 1.30% |

Accounts and notes receivable, Dec. 31, 1973.....................................$3,537,589

Reserve on Dec. 31, 1973, as adjusted (1.30% of $3,537,589)..................... 45,989

Add: Losses charged to reserve in the taxable year (1973)...... $62,709

Less recoveries ................................................... 3,080          59,629

---

[2]The record does not indicate the addition to the bad debt reserve for 1975.

[3]The record does not indicate the balance in the reserve account at the end of 1975.

[4]The formula is derived from *Black Motor Co. v. Commissioner*, 41 B.T.A. 300 (1940), affd. 125 F.2d 977 (6th Cir. 1942), on another issue.

| | |
|---|---:|
| Total reserve requirement | $105,618 |
| Deduct: Reserve as adjusted Dec. 31, 1972 | 72,700 |
| Allowable addition to reserve for 1973 | 32,918 |
| Addition to reserve deducted per return | 106,929 |
| Allowable addition to reserve for 1973 | 32,918 |
| Adjustment to increase income | 74,011 |

Respondent's computations based on the *Black Motor Co.* formula for 1974 were as follows:

| Year | Receivables | Bad debts (net) | Ratio of losses |
|---|---|---|---|
| 1969 | $1,218,241 | $749 | 0.06% |
| 1970 | 1,787,675 | 66,500 | 3.72% |
| 1971 | 2,291,510 | 38,243 | 1.67% |
| 1972 | 4,212,213 | 10,722 | 0.25% |
| 1973 | 3,537,589 | 59,629 | 1.69% |
| 1974 | 7,694,769 | 6,710 | 0.09% |
| | 20,741,997 | 182,553 | 0.88% |

| | | |
|---|---:|---:|
| Accounts and notes receivable, Dec. 31, 1974 | | $7,694,769 |
| Reserve on Dec. 31, 1974 as adjusted (0.88% of $7,694,769) | | 67,714 |
| Add: Losses charged to the reserve in the taxable year (1974)... $12,034 | | |
| Less recoveries | 5,324 | 6,710 |
| Total reserve requirement | | 74,424 |
| Deduct: Reserve as adjusted Dec. 31, 1973 | | [5]45,989 |
| Allowable addition to reserve for 1974 | | 28,435 |
| Addition to reserve deducted per return | | 203,710 |
| Allowable addition to reserve for 1974 | | 28,435 |
| Adjustment to increase income | | 175,275 |

*Issues 2 through 4. Investment Credit and Depreciation.*

In 1966, petitioner built an enclosed structure known as unit 509. This unit is primarily a manufacturing facility for petitioner's irrigation and light pole product lines. A section of unit 509, representing approximately 25 percent of the total area, houses a galvanizing process. Galvanizing is a zinc treatment that petitioner applies to the metal products it manufactures to extend their useful lives. The galvanizing portion of unit 509 has a clear span construction with no interior supports of the roof. It is 216 feet long and approximately 59 feet wide. The eave height is $32\frac{1}{3}$ feet and the peak height of the structure is $36\frac{2}{3}$ feet. Mounted on the primary structure mainframe is an overhead craneway system. The galvanizing section is connected with the remainder of unit 509 by a doorway and common wall.

During 1972, the galvanizing facility in unit 509 was tempo-

---

[5]Corrected for prior year adjustment: $120,000 - 74,011 = $45,989.

rarily closed down. The roof and walls which enclosed that section, originally constructed with corrugated metal, had been damaged extensively by the corrosive fumes of the acid used in the galvanizing process. To remedy this problem, petitioner removed both the entire roof and all the walls of the galvanizing portion of unit 509 leaving only the structural steel frame standing. The damaged areas were subsequently reconstructed and covered with duraform, an acid-resistant, polyethylene-based material. The steel frame was cleaned and painted with an acid-resistant coating. At the same time, all of the rubber- and brick-lined, steel galvanizing tanks in unit 509 were removed and replaced with steel and concrete tanks. The platform upon which these tanks sat was also replaced during that period. The refurbished galvanizing facility was placed in service during 1972.

In 1972, petitioner also constructed and placed in service a second galvanizing facility known as unit 513. Unlike unit 509, however, unit 513 was specifically built to house a galvanizing process in its entirety. The primary structure of this facility is 331 feet long by 79 feet wide with 50-foot-high sidewalls. The clear span structural frame consists of glue-laminated wood mainframes and wood framing members. These materials were used because they can better withstand the acid fumes and heat generated by the galvanizing process than can conventional steel beams. For the same reason, the structure has duraform siding rather than sheet metal siding. The roof is approximately 54 feet high and is made of built-up tar and gravel. Mounted on the primary structure of unit 513, immediately below the roof, is an overhead craneway system used to transport the metal products through the various stages of the galvanizing process. The entire structure of unit 513 is supported by a concrete foundation.

Attached to the primary structure and constituting a part of unit 513 is a 104-foot-long by 24-foot-wide enclosed structure which serves as a housing for the mechanical and boiler room, laboratory, lunchroom, restrooms, and office. This structure has a height of 17 feet and is constructed of concrete block. The roof of this appendage is made of the same material as the roof of the primary structure.

Located at the entry end of unit 513 is an open concrete floor area, 82 feet long by 79 feet wide, which is used primarily as a loading station. The next area of the facility, measuring 131 feet

by 79 feet, consists of a raised concrete platform approximately 4 feet above the floor which supports the steel and concrete galvanizing tanks. Each of these tanks is 8⅔ feet deep of which 2⅓ feet extends below the floor level. The walls of each concrete tank (8 walls) are 57 feet long, and approximately 1 foot thick. A 4-foot-high concrete bunker separates this processing area from the initial loading end of unit 513.

Also located on the raised platform is the galvanizing kettle, a long, 2-inch-thick, 8-foot-deep steel tank containing molten zinc. It rests on a concrete pile cap system completely surrounded by a double firebrick wall and firebrick constructed furnace. The zinc content in this galvanizing kettle is maintained at near 100-percent capacity. This is done to insure that the products can be completely submerged in the molten zinc and to prevent the potential development of "hot spots" which would destroy the kettle. Since zinc is absorbed in the galvanizing process, additional zinc must be added to the kettle at various intervals. To maintain the desired level, approximately 20 percent of the zinc must be replaced every month. The galvanizing kettle is separated from the other process tanks by a concrete bunker.

The kettles in both units 509 and 513 were initially filled (charged) with zinc ingots which were melted in the tanks. In 1972, the cost of the initial zinc charges necessary to fill those kettles was $109,890.72 and $170,827.56, respectively.

The final interior section of unit 513, the post-processing end, is an open concrete floor area, 118 feet by 79 feet, used to unload and cleanup the newly galvanized product. Approximately 60 percent of the total floor area in unit 513 is flat, open space where either hookup or cleanup activities take place.

Located on both sides of unit 513 are two 28-foot by 24-foot steel vertical rollup doors through which material and products are moved into and out of the facility. These doors are large enough so that, if necessary, the steel process tanks can be readily removed from the facility without damaging the structural portions thereof.

Petitioner's galvanizing process is a manual step operation where, at each stage, employees perform various functions with respect to the product to be galvanized. In unit 513, four to six employees work in the entry area on hookup operations. These employees also plug up any holes they find in the product before it is processed. On the raised platform area, there are two crane

operators and two paddlers. The crane operators manually control the craneway system which transports the products through the entire galvanizing process. The paddlers skim off the zinc oxide residue that often forms on top of the kettle. In the post-processing section, six employees are involved in unhooking the product from the crane and cleaning it up. Various hand tools, such as files and impact guns, are used in this cleanup operation.

The employees in the galvanizing facility of unit 509 perform these same operations but on a smaller scale. Thus, two employees work in the entry area, four work on the platform, and another four employees work in the post-processing section.

On June 1, 1978, respondent's representatives inspected units 509 and 513. At that time, petitioner's employees were in the process of covering over the galvanizing tanks in unit 509 with plywood in order to use the platform area as temporary storage for a planned solar manufacturing venture.

On its income tax return for the taxable year ended December 30, 1972, petitioner claimed an investment credit on the entire reconstructed galvanizing enclosure of unit 509 and on the entire structural enclosure of unit 513.[6] In his notice of deficiency, respondent determined that these structures do not constitute qualifying section 38 property and, accordingly, denied the credit.

In its returns for the 3 years at issue, petitioner also claimed depreciation deductions on those properties using a 200-percent declining balance method. Respondent recomputed petitioner's depreciation allowance under a 150-percent declining balance method and disallowed the excess. Finally, on its return for the taxable year ended December 30, 1972, petitioner capitalized the cost of the initial zinc charges in the galvanizing kettles and claimed depreciation and investment credit on those charges. Respondent disallowed both the depreciation deduction and the investment credit.

## OPINION

### Issue 1. Bad Debt Reserve

The first issue is whether respondent abused his discretion by

---

[6]Petitioner also claimed an investment credit on the process tanks and other galvanizing equipment within those facilities. These items, however, are not in dispute.

disallowing part of petitioner's additions to its reserve for bad debts for fiscal years 1973 and 1974. In lieu of deducting specific debts which become worthless within the taxable year, section 166(c) allows, in the discretion of the Commissioner, a deduction for a reasonable addition to a reserve for bad debts. A bad debt reserve is essentially an estimate of future losses which can reasonably be expected to result from debts outstanding at the close of the taxable year. *Handelman v. Commissioner*, 36 T.C. 560 (1961). In determining what constitutes reasonable addition, section 1.166–4(b)(1), Income Tax Regs., provides as follows:

(1) *Relevant factors.* What constitutes a reasonable addition to a reserve for bad debts shall be determined in the light of the facts existing at the close of the taxable year of the proposed addition. The reasonableness of the addition will vary as between classes of business and with conditions of business prosperity. It will depend primarily upon the total amount of debts outstanding as of the close of the taxable year, including those arising currently as well as those arising in prior taxable years, and the total amount of the existing reserve.

If the existing reserve is already adequate to cover expected losses, any further additions will be considered unreasonable and, thus, not deductible. *Messer Co. v. Commissioner*, 57 T.C. 848, 864 (1972).

In view of the discretion granted respondent by section 166(c), his determination as to the reasonableness of any addition made to a bad debt reserve carries more than the usual presumption of correctness. *Roth Steel Tube Co. v. Commissioner*, 68 T.C. 213, 218 (1977); *Roanoke Vending Exchange, Inc. v. Commissioner*, 40 T.C. 735, 741 (1963). Therefore, petitioner must not only show that its additions to the reserve were reasonable, but must also demonstrate that respondent's disallowance of the claimed additions was arbitrary and constituted an abuse of discretion. *Westchester Development Co. v. Commissioner*, 63 T.C. 198, 211 (1974).

In disallowing a portion of petitioner's additions to its reserve for fiscal years 1973 and 1974, respondent applied the 6-year moving average formula approved by this Court in *Black Motor Co. v. Commissioner*, 41 B.T.A. 300 (1940), affd. 125 F.2d 977 (6th Cir. 1942), on another issue.[7] This formula, based entirely on petitioner's past chargeoff experience, yielded an average bad

---

[7] The validity of this formula has been upheld by the Supreme Court. See *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979).

debt ratio of 1.30 percent for the 6-year period ending December 1973 and 0.88 percent for the 6-year period ending December 1974. After multiplying these percentages by the 1973 and 1974 yearend outstanding receivables, respondent arrived at a reasonable reserve requirement of $45,989 and $67,714, respectively. Accordingly, to the extent petitioner's additions exceeded the amount necessary to bring the reserve balance to these levels, respondent disallowed the deductions.

Petitioner contends that respondent's application of the *Black Motor Co.* formula and his failure to consider other factors in existence at the end of 1974 amounted to a clear abuse of discretion.[8] Petitioner argues that a pure historical approach for determining its 1974 reserve requirements was arbitrary and unreasonable because it ignored such relevant "current" factors as the deteriorating economic conditions in the industry, the enormous increase in accounts receivable, the age of its receivables, the large number of doubtful and contested accounts, and the risk of substantial loss should a number of specific accounts become worthless. In support of its position, petitioner cites *Calavo, Inc. v. Commissioner*, 304 F.2d 650 (9th Cir. 1962), revg. a Memorandum Opinion of this Court; *Westchester Development Co. v. Commissioner, supra; Richardson v. United States*, 330 F. Supp. 102 (S.D. Tex. 1971); and *Apollo Steel Co. v. Commissioner*, a Memorandum Opinion of this Court dated April 13, 1945.

Respondent argues that the allowable reserve was more than sufficient to cover the 1975 estimated losses. On the record before us, we must agree.

After a careful examination of the record, we conclude that petitioner has not satisfied its "heavy burden" of showing respondent abused his discretion. Although disregard of a taxpayer's changed business circumstances can constitute such an abuse (*Richardson v. United States, supra*), petitioner has failed to demonstrate that changed conditions in 1974 caused collection of its outstanding debts to be less likely than in the past. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522 (1979). Petitioner argues that there were deteriorating economic conditions in late 1974 which adversely affected collectibility of its accounts. While the record does indicate a slight market

---

[8]On brief, petitioner admitted that the evidence introduced at trial related solely to fiscal 1974. Since petitioner obviously failed to prove any abuse of discretion with respect to fiscal 1973, we must sustain respondent's determination for that year.

downturn during that period, there is no evidence that comparable business declines did not exist in prior years. In this connection, we note that the *Black Motor Co.* formula covers a 6-year span during which time a variety of economic fluctuations would normally occur. Accordingly, absent any evidence that this particular market decline was somehow unrepresentative, we find petitioner's reliance on this circumstance misplaced.

Moreover, the substantial increase in petitioner's accounts receivable during 1974 does not make the *Black Motor Co.* formula inapplicable. To the contrary, since the computation of the reserve, under that method, is based upon the total yearend receivables, the formula necessarily incorporates and is directly responsive to such changes in business volume. *Atlantic Discount Co. v. United States*, 473 F.2d 412, 415 (5th Cir. 1973).

In addition, the record does not reveal whether petitioner's credit policy had been more restrictive in the past or that its delinquencies were on the rise. The testimony of Lee Salmans reveals that petitioner was quite willing to accept slow payment from certain customers in order to penetrate various geographical markets. Consequently, petitioner's evidence regarding the aging of its receivables, without more, is simply insufficient to overcome respondent's discretionary application of the *Black Motor Co.* formula. Cf. *Messer Co. v. Commissioner, supra; United States v. Haskel Engineering & Supply Co.*, 380 F.2d 786 (9th Cir. 1967).

Furthermore, despite the reported claims of doubtful and contested accounts, petitioner failed to offer credible evidence establishing that payment from any specific customer in 1975 was unlikely. Although petitioner argues that certain designated customers were in weak financial positions during 1974, there is nothing in the record to indicate that those customers were financially healthy in prior years. Nor does the record show that petitioner was confronted with any extraordinary credit reversals in 1974 which rendered its past bad debt experience an unreliable guide for measuring probable future losses. Compare *Calavo, Inc. v. Commissioner, supra*, and *Apollo Steel Co. v. Commissioner, supra*.

Petitioner's argument that the potential worthlessness of its larger accounts justifies a greater addition to its reserve than allowed by respondent misses the point. While we can appreciate petitioner's sound business desire to protect itself against the

risk of significant losses in subsequent years, a reserve established for such purposes is not the type contemplated by section 166(c). *Massachusetts Business Development Corp. v. Commissioner*, 52 T.C. 946, 952 (1969); *Investors Discount Corp. v. Commissioner*, 48 T.C. 767, 771 (1967). Moreover, considering the security filings placed on its irrigation products in 1974, the potential risk of future loss to petitioner was actually minimized.

Still further support for respondent's determination is provided by an examination of petitioner's bad debt history. During the 6-year period ending in December 1974, petitioner's actual bad debts averaged less than 1 percent of its outstanding receivables. For every year but 1970, petitioner's reserve, without additions, exceeded the actual bad debts suffered. In 1974, when the volume of its receivables nearly doubled over 1973, petitioner's bad debts decreased even more drastically. While the record does not indicate all the factors responsible for the decrease, it is reasonable to assume that petitioner's collection practices and the cash discounts offered to its customers had significant effects.

In light of this recent bad debt history, we believe that collectibility of petitioner's outstanding receivables was in fact more likely at the end of 1974 than in most of the years upon which respondent based his average. Cf. *Thor Power Tool Co. v. Commissioner, supra*. As it turned out, a balance of $67,714 in its bad debt reserve for fiscal 1974 would have been more than ample to offset the $9,753 in actual bad debts incurred during 1975. While our decision cannot rest upon this subsequent loss experience (*Westchester Development Co. v. Commissioner, supra* at 212), nevertheless, these subsequent losses are considered additional evidence corroborating the reasonableness of respondent's adjustments. *Roanoke Vending Exchange, Inc. v. Commissioner, supra* at 741. Under these circumstances, we hold that petitioner has failed to prove that respondent's disallowance of the claimed additions amounted to an abuse of discretion.

### Issue 2. Investment Credit

The second issue is whether petitioner is entitled to a tax credit under section 38[9] in 1972 for its investment in two

---

[9]SEC. 38. INVESTMENT IN CERTAIN DEPRECIABLE PROPERTY.

(a) GENERAL RULE.—There shall be allowed, as a credit against the tax imposed by this chapter, the

galvanizing facilities designated as units 509 and 513. The resolution of this issue depends upon whether these structures qualify as "section 38 property" as that term is defined by section 48. Section 48, in part, provides:

SEC. 48. DEFINITIONS: SPECIAL RULES.
  (a) SECTION 38 PROPERTY.—
    (1) IN GENERAL.—Except as provided in this subsection, the term "section 38 property" means—
      (A) tangible personal property, or
      (B) other tangible property *(not including a building and its structual components)* but only if such property—
        (i) is used as an integral part of manufacturing, production or extraction * * *
  [Emphasis added.]

Respondent contends that unit 513 and the galvanizing portion of unit 509 are "buildings" for which an investment credit is not allowable. Petitioner argues that these structures are not "buildings" within the meaning of section 48, but instead, are "other tangible property" used as an integral part of its production process. For the reasons set out below, we agree with respondent.

Pursuant to section 38(b), respondent, in sec. 1.48–1(e), Income Tax Regs., has defined the term "buildings" as follows:

Sec. 1.48–1 Definition of section 38 property.
(e) *Definition of building and structural components.* (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced.

---

amount determined under subpart B of this part.
  (b) REGULATIONS.—The Secretary or his delegate shall prescribe such regulations as may be necessary to carry out the purposes of this part and subpart B.

Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples.

This regulation reflects congressional intent that the term "building" be given its commonly accepted meaning. *Satrum v. Commissioner*, 62 T.C. 413, 416 (1974); H. Rept. 1447, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 516; S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 858–859.

This regulation has been construed as establishing a function or use test for determining whether a given structure was a "building." *Lesher v. Commissioner*, 73 T.C. 340 (1979); *Brown-Forman Distillers Corp. v. United States*, 205 Ct. Cl. 402, 499 F.2d 1263 (1974). *Thirup v. Commissioner*, 508 F.2d 915, 919 (9th Cir. 1974), revg. 59 T.C. 122 (1972). Under this test, the major inquiry has been whether the structure provides "working space" for employees that is more than merely incidental to the primary function of that structure. *Brown-Forman Distillers Corp. v. United States, supra; Catron v. Commissioner*, 50 T.C. 306, 311 (1968).

In *Yellow Freight System, Inc. v. United States*, 538 F.2d 790 (8th Cir. 1976), however, the Eighth Circuit interpreted this regulation and the legislative history underlying the investment credit provisions as requiring a consideration of both the function and the appearance of the structure in question. Since an appeal in this case lies in the Eighth Circuit,[10] we will also apply the two-prong test adopted by that court. See *Lesher v. Commissioner, supra.*

In terms of their physical appearance, petitioner's galvanizing facilities bear the unmistakable look of buildings. The structural design, dimension, and physical attributes of these facilities are such that they closely resemble the examples of "buildings" listed in the regulations. Photographs in the record and the testimony of witnesses confirm this conclusion. Moreover, on brief, petitioner made no argument to the contrary. Accordingly, we hold for respondent on the "appearance test."

---

[10] Sec. 7482(b)(1)(B).

Respondent next contends that the structures also qualify as "buildings" under the function or use test. Respondent asserts that these facilities provided "working space" where petitioner's employees engaged in a broad range of activities directly related and highly essential to the operation of the galvanizing process.

Petitioner contends that the work done by those employees was both insubstantial and insignificant in relation to its entire galvanizing operation. Relying principally upon *Satrum v. Commissioner, supra,* and *Brown-Forman Distillers Corp. v. United States, supra,* petitioner further argues that the employee activity within those two facilities involved nothing more than mere maintenance and collection of goods. Accordingly, petitioner concludes that these structures only served as storage or processing chambers and did not furnish sufficient working space to constitute buildings for investment credit purposes. We disagree.

In our view, the record clearly demonstrates that petitioner's galvanizing facilities provided the requisite "working space" to satisfy the functional test. We reach this conclusion based upon a consideration of both the quantity and nature of the employee activity within the two facilities.[11]

See *Yellow Freight System, Inc. v. United States, supra* at 796–797; *Satrum v. Commissioner, supra* at 417.

Although the amount of human activity inside the galvanizing facilities did not approach the levels of either *Yellow Freight System, Inc. v. United States, supra* (a maximum of 80 full-time employees working approximately 1,925 man-hours per day), or *Sunnyside Nurseries v. Commissioner,* 59 T.C. 113 (1972) (approximately 50 employees working 5 days a week, 7½ hours per day), we do not believe that there exists any minimum degree of activity, below which a structure ceases to provide "working space." Instead, the proper inquiry is whether "a substantial number of employees were frequently and regularly occupied" in the facility. *Sunnyside Nurseries v. Commissioner, supra* at 121. This determination will necessarily depend upon the nature of the business venture housed within that structure.

Applying this standard to the facts before us, we conclude that the quantum of employee activity in units 509 and 513 was

---

[11]Compare *Thirup v. Commissioner,* 508 F.2d 915, 919 (9th Cir. 1974), revg. 59 T.C. 122 (1972), in which the Ninth Circuit looked solely to the nature of the employee activity rather than the amount of such activity.

sufficiently substantial to indicate that those structures provided working space. Since the galvanizing process was not automated, constant employee participation was required at each step of the operation. Thus, the crane operators, manually directing the craneway apparatus, transported products from the loading station through the processing tanks and finally to the post-production area. Various employees prepared the product for galvanizing while others, using hand-held tools, cleaned the newly treated metal. Still other employees, known as paddlers, skimmed excess zinc from the tops of the kettles. This frequent and regular employee activity was unlike the more limited activity in the cases cited by petitioner. Furthermore, the fact that only 10 to 16 employees performed these functions does not change our result, for in the context of petitioner's galvanizing operation, that number was indeed "substantial." Accordingly, we reject petitioner's first contention that the amount of activity was de minimis.

We must also reject petitioner's argument that the nature of the work performed by the employees was insignificant and thus comparable to the maintenance and collection of goods. The record clearly establishes that the metal products could not have been galvanized without the concerted efforts of those individuals. To be sure, some ancillary loading and maintenance work was necessarily involved. However, that activity was simply one aspect of the overall employee responsibility in the operation. Other duties, such as metal preparation, cleaning, and paddling were more directly and fundamentally related to the galvanizing process itself. Petitioner's attempt to downgrade the importance of those functions is, therefore, unpersuasive.

Moreover, the cases relied on by petitioner do not support its position. In both *Satrum v. Commissioner, supra,* and *Brown-Forman Distillers Corp. v. United States, supra,* the employee activity was merely supportive of and ancillary to the principal function of the structures involved therein. Here, on the other hand, the human activity was obviously essential to that function. Consequently, since it is clear that these galvanizing facilities provide "working space," we must hold that they functioned as buildings.

Petitioner argues, however, that its galvanizing facilities were "special purpose structures" within the meaning of section 1.48–

1(e)(1), Income Tax Regs., and, therefore, are exempted from the definition of "buildings." We cannot agree.

In pertinent part, section 1.48–1(e)(1)(ii), Income Tax Regs., provides that the term building does not include—

(ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes.

A careful reading of the relevant legislative history clearly indicates that the kind of structure intended to qualify under this regulatory exception are those which are essentially "skin coverings" for the equipment and machinery which they house. S. Rept. 92–437, 92d Cong., 1st Sess. (1971), 1972–1 C.B. 575; *Endres Floral Co. v. United States*, 450 F. Supp. 16, 25 (N.D. Ohio 1977). The structures which satisfy this requirement are, in effect, mere extensions of that property and, consequently, are considered to be an integral part thereof for purposes of the investment credit. Examples of these mechanical-type structures are enumerated in the regulation. They include oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, coke ovens, brick kilns, and coal tipples.

Petitioner advances three major arguments in support of its position. Petitioner initially contends that since both structures would be replaced at the time the galvanizing process was retired, the facilities fit squarely within the plain language and intended scope of this regulatory exclusion. As a basis for this conclusion, petitioner points to the fact that when the galvanizing tanks in unit 509 were replaced in 1972, the roof and walls of that section were also replaced. Finding petitioner's reliance on that incident misplaced, we reject this first argument.

The evidence fails to support petitioner's claim that it is reasonable to expect replacement of these structures if the machinery and equipment housed within were to be replaced. The temporary replacement of the roof and walls in unit 509 was simply a remedial measure taken to correct a then-existing acid fume problem and was not, as petitioner maintains, an inevitable consequence following its removal of the processing tanks. In

addition, we note that petitioner subsequently covered the roof and walls with duraform and treated the steel framework with acid-resistant coating. Since that time those structural components have not been replaced nor has petitioner shown deterioration which would make future replacement likely. Accordingly, the acid problem which petitioner cites as causing the contemporaneous replacement of both structure and machinery in unit 509 no longer exists.

Furthermore, respondent's engineering expert, William Stewart, testified that units 509 and 513 contain equipment with useful lives significantly shorter than those of the structural elements. These items include heat instrumentation and control equipment, acid pumps, steel processing tanks, galvanizing kettles, and the furnace. Based upon this expert testimony, it is clear that those two structures need not be replaced when that equipment is eventually retired.

Petitioner next argues that units 509 and 513 were "special purpose" structures because they could not be economically used for purposes other than zinc galvanizing. Petitioner's reasoning is as follows: (1) The size and location of the processing equipment would limit the available space necessary to support other manufacturing or production operations; (2) the costs and related problems involved in removing the concrete platform housing the galvanizing tanks would be prohibitive; and (3) the costs of heating and lighting the structures for "normal" manufacturing purposes would be substantial considering the excessive height of these structures.

Disputing each of these claims, respondent maintains that it would be economically feasible to convert units 509 and 513 to alternative uses. In this regard, respondent contends that the clear span construction of these facilities renders them particularly ideal for line production work. The open interior areas, respondent argues, could easily be adapted for other types of processing or manufacturing operations. Respondent further contends that the platform area could readily be removed from the facilities or, alternatively, boarded over and used for storage. Since we find these structures not restricted to their present function and believe that they can be economically adapted to other uses, we must hold for respondent.

Petitioner has simply failed to offer any evidence supporting its assertion that these facilities are limited to the purposes for

which they now serve. Notwithstanding the size and location of the concrete platform, these structures contain vast open areas which presently are used for loading and cleanup activities. In unit 513, for example, this nonprocessing area measures 200 feet by 79 feet and consists totally of flat, unobstructed floor space. Consequently, there is nothing which would prevent this area from being used as working space for any number of activities.

Moreover, the raised platform area itself can be adapted to alternative uses. In fact, during their 1978 inspection of unit 509, respondent's representatives discovered petitioner's employees preparing to utilize that platform for storage in an unrelated manufacturing business. Accordingly, since petitioner obviously believed that its facilities were suitable for other purposes, its contentions, on brief, to the contrary must be rejected.

Petitioner's argument with respect to the economic cost of converting these facilities to alternative uses is also unpersuasive. While petitioner would undoubtedly incur some additional costs, there has been no showing that such a conversion would be economically unfeasible. Cf. *Lesher v. Commissioner, supra;* cf. *Satrum v. Commissioner, supra.* The structural layout of these facilities is such that the steel galvanizing tanks could be removed through the large doors without damaging the structural elements. Although the concrete tanks could not be removed, testimony supports that they could be easily demolished with a jackhammer or similar equipment. In this connection, William Stewart has stated that "it's cheaper to use common labor to tear out something like that than it is to build a new building." Moreover, we find it highly significant that petitioner, in fact, removed the entire platform from unit 509 at the time of the reconstruction in 1972. Certainly, if it was possible to replace the platform in 1972, there is no reason to assume that future removal would be economically unfeasible.

Petitioner's third major argument is that since units 509 and 513 were specially designed to provide for the stress and demand of the galvanizing process, they are, therefore, "special purpose" structures within the meaning of section 1.48–1(e)(1), Income Tax Regs. In support of this position, petitioner points to such special construction features as the duraform siding and roofing, the wood framework of unit 513, and the height of each enclosure. We find this argument unpersuasive.

Petitioner has obviously failed to distinguish between a

qualifying "special purpose structure" and a building designed for a specific use. To be sure, every manufacturing facility is, to some extent, specially designed to accommodate the nature of the process conducted within. Thus, walls, floors, and roofs may be of a specific dimension, design, or construction. In the instant case, this is clearly illustrated by the use of acid-resistant materials to extend the useful lives of these structures. Such measures, however, do not necessarily transform a building into a "special purpose" structure. Instead, that term is far more limited in its meaning. Only those specially designed structures which are so integrally related to the equipment they house that they constitute mere coverings for that equipment qualify. Units 509 and 513 were not specifically designed simply to "cover" the galvanizing tanks and related equipment within those facilities. Thus, they are unlike storage bins, oil tanks, blast furnaces, and other regulatory examples of "special purpose" structures.

For all of the reasons discussed herein, we hold that units 509 and 513 are "buildings" and, accordingly, deny petitioner's claimed investment credit.

## Issue 3. Depreciation

The next issue is whether petitioner is entitled to depreciate the reconstructed galvanizing enclosure of unit 509 and the entire structural enclosure of unit 513 using the double declining balance method. Petitioner argues that since these structures are "section 1245" property, they can be depreciated under that accelerated method. Respondent contends that these structures constitute "section 1250" property for which double declining balance depreciation is unavailable. For the reasons set out below, we hold for respondent.

As defined by section 1250(c), the term "section 1250 property" means any real property (other than section 1245 property) which is or has been property of a character subject to the allowance for depreciation provided by section 167.[12]

Section 1245(a)(3), moreover, specifically excludes buildings and their structural components from the definition of "section 1245 property." Furthermore, section 1.1245–3(c)(2), Income Tax

---

[12]Sec. 167(a) allows as a deduction a reasonable allowance for the exhaustion, wear and tear of property used in the trade or business or held for the production of income.

Regs., provides that "building" is defined by reference to its meaning for investment credit purposes. Accordingly, since we have held these structures to be nonqualifying "buildings" under section 48, we conclude that they are also "section 1250 property."

Having resolved this initial question, we must now decide the substantive depreciation issue. Section 167(b)(2) generally permits a taxpayer to compute an allowance for depreciation using the double declining balance method. In the case of "section 1250 property," however, the availability of this accelerated method is substantially limited by section 167(j)(1).[13] An exception to this limitation is contained in section 167(j)(3) which, in relevant part, provides as follows:

Paragraph (1) of this subsection shall not apply, and subsection (b) shall apply, in the case of property—

(A) the construction, reconstruction, or erection of which was begun before July 25, 1969 * * *

Since unit 513 was constructed in 1972, it clearly does not fall within this exception. Accordingly, double declining balance depreciation cannot be taken on that structure.

With respect to unit 509, petitioner originally constructed the galvanizing portion in 1966 and has depreciated that section using the double declining balance method. Respondent does not dispute the correctness of that action. In 1972, petitioner reconstructed that section and now seeks to depreciate the costs on the same accelerated method. The issue, therefore, is whether

---

[13] SEC. 167. DEPRECIATION.

(j) SPECIAL RULES FOR SECTION 1250 PROPERTY.—

(1) GENERAL RULE.—Except as provided in paragraphs (2) and (3), in the case of section 1250 property, subsection (b) shall not apply and the term "reasonable allowance" as used in subsection (a) shall include an allowance computed in accordance with regulations prescribed by the Secretary, or his delegate, under any of the following methods:

(A) the straight line method,

(B) the declining balance method, using a rate not exceeding 150 percent of the rate which would have been used had the annual allowance been computed under the method described in subparagraph (A), or

(C) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including the taxable year, does not, during the first two-thirds of the useful life of the property, exceed the total of such allowances which would have been used had such allowances been computed under the method described in subparagraph (B).

Nothing in this paragraph shall be construed to limit or reduce the allowance otherwise allowable under subsection (a) except where allowable solely by reason of paragraph (2), (3), or (4) of subsection (b).

we look to the pre-July 25, 1969, construction or the post–1969 reconstruction.

In this regard, we note that the statutory provision and the regulations thereunder provide little insight. See sec. 1.167(j)–4, Income Tax Regs. Thus, one could possibly read that statute to allow double declining balance depreciation in this case because construction of the galvanizing portion began before July 25, 1969, even though reconstruction began after. We believe, however, that such an interpretation would be contrary to the legislative intent and could effectively nullify the depreciation limitations provided by section 167(j)(1). See H. Rept. 91–413 (1969), 1969–3 C.B. 407; S. Rept. 91–552 (1969), 1969–3 C.B. 557. Accordingly, since reconstruction began after the statutory focal date, we hold that petitioner cannot depreciate that section on a declining balance method.[14] Petitioner can, however, continue to use that accelerated method with respect to the original construction costs of unit 509.

*Issue 4. Depreciation and Investment Credit on Zinc Charge*

The final issue is whether petitioner is entitled to depreciation and an investment credit on the initial zinc charges to the galvanizing kettles in units 509 and 513. Respondent argues that the zinc charge is not depreciable property nor does it have a useful life of more than 3 years for investment credit purposes. Instead, respondent claims that the zinc is an inventory item which is replenishable as used in the galvanizing process.

Petitioner, on the other hand, argues that the zinc ceases to be inventory once it is placed in the galvanizing kettles. Accordingly, petitioner maintains that because the zinc is so integrally related to the galvanizing process, it should be considered part of the kettle itself and entitled to depreciation and investment credit on the same basis. We disagree.

It is well-settled law that the section 167 allowance for depreciation does not apply to inventory or stock in trade. See, sec. 1.167(a)–2, Income Tax Regs.; *Luhring Motor Co. v. Commissioner*, 42 T.C. 732, 751 (1964). Thus, the products manufactured and sold by petitioner in the ordinary course of business are

---

[14]In the notice of deficiency, respondent determined that the useful life of the galvanizing enclosure was 25 years. Respondent subsequently stipulated, however, that this useful life was only 15 years. Consequently, a Rule 155 computation will be necessary.

clearly nondepreciable items. Moreover, direct costs incident to the manufacture or processing of such items are includable in the "inventorial costs" of the products. See sec. 1.471–11(b)(2)(i), Income Tax Regs.

In the instant case, the initial zinc was consumed in the ordinary course of the galvanizing process and became an integral part of the finished product. Being a direct inventory production cost, it constitutes nondepreciable property. Accordingly, it follows that the investment credit with respect to the zinc is also denied. See sec. 48(a)(1).[15]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

[15]Since 20 percent of the zinc is replaced every month, it is clear that the useful life of the initial zinc charge was less than 1 year. Consequently, depreciation and investment credit on such property is not allowable in any event.